NOT DESIGNATED FOR PUBLICATION

No. 118,343

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JACOB COLEMAN EWING,
*Appellant*.

MEMORANDUM OPINION

Appeal from Jackson District Court; NORBERT C. MAREK, JR., judge. Opinion filed March 29, 2019. Reversed and remanded.

*Trevor C. Wohlford*, *Kathleen Ambrosio*, and *John J. Ambrosio*, of Morris, Laing, Evans, Brock & Kennedy, Chtd., of Topeka, for appellant.

*Steven J. Obermeier*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.

Before MALONE, P.J., HILL, J., and WALKER, S.J.

PER CURIAM: A jury convicted Jacob Coleman Ewing of two counts of rape, four counts of aggravated criminal sodomy, two counts of battery, one count of possession of drug paraphernalia, one count of hosting minors consuming alcohol, and one count of furnishing cereal malt beverages to a minor. Ewing argues that his convictions must be reversed because of prosecutorial error in closing argument and because the district court erred by: (1) consolidating two cases for trial; (2) admitting certain evidence at trial, including evidence of pornography allegedly viewed by Ewing; (3) denying his request

1

for a mental health examination of a complaining witness; and (4) denying his motion to admit evidence of prior sexual contact with the complaining witnesses.

The extensive record in this case consists of 20 volumes of materials and includes more than 2,000 pages of hearing transcripts and nearly 150 exhibits. After thoroughly reviewing the record on appeal, we have identified two serious errors committed in Ewing's trial. First, the district court admitted evidence of pornography allegedly viewed by Ewing without the State showing that Ewing had ever viewed the pornography or that it was relevant to the charges brought against him. Second, the prosecutor erred in closing argument by misstating the evidence that was presented to the jury and inflaming the passions of the jury. Based on a combination of these two errors—and because the State fails to convince us that the errors did not affect the verdicts—we conclude that Ewing was denied his constitutional right to a fair trial. Thus, we are compelled to reverse Ewing's convictions and remand this case to the district court to conduct a new trial.

FACTUAL AND PROCEDURAL BACKGROUND

*May 2016 incident involving J.M.*

At around 3 a.m. on May 6, 2016, Al Dunn of the Jackson County Sheriff's Department responded to a 911 call where officers informed him that 18-year-old J.M. was reporting that Jacob Ewing had "beaten [her] up for not doing what he wanted her to do." Dunn interviewed J.M. at the sheriff's office, and she said that Ewing, whom she had previously known and spent time with, had called her a little after 9 p.m. the night before and invited her to his house. When she arrived at about 10:30 p.m., Ewing and some other men were playing a drinking game. J.M. drank a beer and, around midnight, the other men left and J.M. went upstairs to go to sleep in Ewing's bedroom. Ewing came into the bedroom and began trying to take her shirt off, but J.M. resisted, telling him that

2

they needed to talk. Ewing said that they could talk if she took off her shirt, but when she did so, he pulled off her sweatpants and ripped off her underwear.

J.M. did not want to have sex with Ewing, but he grabbed her hair and forced his penis into her mouth. When J.M. used her teeth on his penis to make him stop, he hit her six or seven times and told her to stop. Ewing put his penis in J.M.'s vagina and hit her several more times; he tried to put his penis in her anus, but J.M. said she "mov[ed] around quite a bit" so that he could not penetrate her anus. Ewing put his penis back into J.M.'s mouth. When J.M. heard Ewing snoring, she got up, got dressed, and left Ewing's house. She went to her friend Doug Sanson's home, and he convinced her to call 911.

J.M. reported "a lot of ringing in her ear from being hit in the ear." Dunn suggested that J.M. go to the hospital for an examination, and he advised that she not take a shower or clean herself before then, but J.M. wanted to go home, not to the hospital. Dunn collected J.M.'s DNA and the underwear she was wearing, and he photographed J.M.'s text messages with Ewing from the previous night. Although Dunn observed no bruising or injuries on J.M., he also took photographs of the areas of her face she said were injured. Shortly thereafter, J.M. went home to Perry, Kansas.

Dunn obtained a search warrant for Ewing's house that he executed just after 9 a.m. that same day. During the search, law enforcement found two shotguns, a high-powered rifle, a handgun, a hunting knife, an expandable baton, a cell phone, and multiple pipes and a bong containing burnt marijuana residue. Dunn used a blue light to search for biological material on Ewing's mattress and on some sheets that were wadded up on the floor, but other than saliva on the upper right corner of the mattress, Dunn saw no such evidence.

Dunn advised Ewing of his *Miranda* rights, which he waived. According to Dunn, Ewing acknowledged that he had invited J.M. over the night before. Ewing told Dunn

3

that they played a drinking game, J.M. had two beers, and everyone else left around midnight. He and J.M. went upstairs, he turned on the television, and the last thing he remembered was turning on Netflix. Ewing woke up the next morning in a puddle of urine and, while he was showering, law enforcement arrived to execute the search warrant. Dunn looked for but did not find a puddle of urine. When Dunn asked Ewing what could have caused J.M.'s "sore ears," Ewing replied that he did not remember and he did not know. Similarly, Ewing had no explanation for J.M.'s ripped underwear, and when Dunn asked whether Ewing's DNA would be found on J.M.'s underwear, Ewing said "if his DNA was found on her, then he guessed they did have sex." However, Ewing denied sexually assaulting J.M., and he gave Dunn a list of 18 ex-girlfriends whom he believed would vouch for his character.

Ewing did admit that the pipes were his and that he had smoked marijuana in them "some time" ago. He also voluntarily provided Dunn with DNA samples, as well as a handwritten statement that matched his verbal statement. J.M. was gone when Ewing woke up, but he assumed she had left for work.

Meanwhile, at her home in Perry, Kansas, J.M. slept for a few hours, then went to work with her grandfather. Contrary to Dunn's advice, J.M. showered, ate, drank fluids, and used the bathroom before she went to the hospital later that day, accompanied by two friends, Stephanie and Aubrey. Stephanie later told KBI Special Agent Ivonne Santa that J.M. had called her the night before at 3 a.m., crying hysterically, and said that Ewing had raped her. However, when Stephanie checked her cellular phone records, she did not find any record of that call.

At approximately 5:15 p.m. on May 6, 2016, Jennifer Harris, registered nurse and experienced Sexual Assault Nurse Examiner (SANE), examined J.M. J.M. reported difficulty hearing and pain over and behind her left ear; she told Harris that her assailant had "tried to force her to perform oral sex on him" and she had tried to "bite down on

4

him," so he hit her on the side of the head. When Harris looked at those areas, she saw what appeared to be an abrasion on J.M.'s earlobe. J.M. also told Harris that her assailant had penetrated her vagina with his penis, digitally penetrated her rectum, and attempted to penetrate her rectum with his penis. Harris physically examined J.M.'s genitals and saw an abrasion and redness just below the hymen that surrounds the vaginal opening, and she observed that the area was sensitive to the touch. Harris examined J.M.'s rectum, but saw no abnormalities. Harris took photographs of J.M.'s face and her genitals. J.M. underwent a CT scan, which showed no abnormalities.

On May 16, 2016, Jackson County Sheriff's Office Detective Phil McManigal interviewed Ewing after he was advised of and waived his *Miranda* rights. Ewing said that on May 5, 2016, he attended a barbecue at the home of his neighbors and friends, Andrew and Kendyl Lemon, after which he and some friends, including Justin Wilcox, went to Ewing's home and played a drinking game. Ewing and Wilcox began contacting girls to invite them over, and J.M. accepted Ewing's invitation. When she arrived, she was wearing white shorts and a top, but she later changed into sweatpants and a t-shirt. Ewing stated that he and J.M. eventually went to his bedroom. They sat on the bed, he put Netflix on the television, and he passed out. When he woke up the next day, he had wet the bed, so he took the sheets off the bed, threw them on the floor, and went to take a shower. While he was in the shower, he heard knocking at his door and, when he answered the door, it was the police to execute the search warrant.

Ewing told McManigal that he had been "on the verge of blacking-out drunk" and when he got "too drunk," he was unable to have sex. Ewing specifically denied having sex with or injuring J.M., and when McManigal asked how J.M. got the injury behind her ear, Ewing stated she must have done it to herself. Although he was a mixed martial arts fighter who admittedly enjoyed roughhousing with friends, Ewing said that he prided himself on never harming a woman. Ewing again provided a list of individuals to vouch for his character.

5

*Investigation leads law enforcement to M.W.*

In late May 2016, Dunn spoke to B.B., who was on the list of ex-girlfriends Ewing had provided. B.B. told Dunn that Ewing had not done anything to her personally, but a woman named M.W. had texted her saying that she had been raped by Ewing and "she was trying to find some girls to get together to bring charges against" Ewing. Following up on this information, Dunn called M.W., and, when he explained that he had received her name in association with Ewing, M.W. began to cry. She told Dunn that Ewing had raped her, and, at Dunn's request, M.W. came to the sheriff's office later that day for an interview.

M.W.—who was 23 years old at the time of the interview—told Dunn that in September 2014, she was dating Ewing and on September 9 of that year, he invited her to a party at his home for his brother, Drake Ewing, who was leaving for the Marines. When M.W. arrived at the party, there were several men there, and there was a half of a bottle of Crown Royal in the kitchen. M.W. drank two beers and a shot of Crown Royal that had been poured by a friend of Ewing's and left on the kitchen table. Right after she drank the shot, things became blurry and she began feeling out-of-control; M.W. believed she had been drugged with ketamine, and she could only remember bits and pieces of the evening from that point on.

M.W. remembered arguing with Drake, who left the house. She also remembered being naked on the floor, with Ewing on top of her with his penis in her vagina, and hearing the movie Old Yeller playing in the background. At one point, Ewing "rammed his penis" into her anus; it hurt, and M.W. screamed, but Ewing "just held her down until he finished." Afterward, M.W. got up and went into the bathroom. She looked at herself in the mirror and saw blood on her legs; then she returned to the living room and sat on the couch. M.W. told Dunn that she might have had sex with Ewing at that point, but she was not sure; when she woke up again the next morning, she was naked and Ewing was

6

asleep, so she left. When M.W. got home, her mother, S.W., and M.W.'s friends, Misty and Jaelyn, were there. They asked if she had been in an accident, and she said she had been raped. S.W. suggested that M.W. go to the police, but M.W. did not want to because her memories of the night were unclear. Misty used her cell phone to photograph bruises on M.W.'s body.

Later that morning, Ewing texted M.W. wanting to know where she had gone, and M.W. confronted him about the events of the previous night. Ewing denied raping her, and eventually he "convinced [M.W.] he did not" rape her. When she spoke with Dunn in May 2016, M.W. said that since the night with Ewing, she had nightmares, suffered from depression, suffered from anxiety, and had medical problems.

After the interview with M.W., Dunn interviewed S.W., Misty, and Jaelyn, who all told him that M.W. had come home from Ewing's house on a morning in September 2014 and said that Ewing had raped her. S.W. told Dunn that M.W. had "bruises all over" that were not there when she had left for Ewing's home the night before, and Misty and Jaelyn said that in the days following, M.W. "was not herself." Similarly, M.W.'s cousin, Mikela, told McManigal that in the fall of 2014, M.W. told her that she had been raped by Ewing. Mikela saw bruises on M.W. and tried to convince M.W. to tell the police, but M.W. said "she didn't want to put herself through all that bullshit."

McManigal spoke with M.W.'s friend, Micah, who said that in the fall of 2014, M.W. showed him bruises "the size of fingertips" and told him Ewing had raped and sodomized her. M.W. had told Micah that Ewing invited her through Facebook to come over, that she felt "sedated" after drinking something at Ewing's home, and that she remembered standing in front of Ewing's bathroom mirror, bleeding from her anus, with blood running down her legs, while Ewing stood behind her, rubbing her arms and telling her she was okay.

7

*Ongoing investigation and other claims of sex crimes*

On July 14, 2016, McManigal interviewed Lane Lassiter, who had been at Ewing's home on May 5, 2016, when J.M. arrived. Lassiter said that J.M. "sat there and didn't say anything" and that he had not seen her drinking. He stated that Ewing was not drunk that night and the party ended when Ewing told everyone that he was tired and wanted to go to bed.

In July 2016, Senior Special Agent Mark Malick of the Kansas Bureau of Investigation (KBI) became involved with the case. Malick spoke with J.M., who informed him that she had lost hearing in one ear for a couple of days, that her ear still rang "off and on," that she got headaches, and that she occasionally "los[t] vision."

Malick conducted a series of interviews related to the investigation. He spoke with Kendyl and Andrew Lemon, Ewing's neighbors, who told him that Ewing attended a barbecue at their home on May 5, 2016, and Ewing and his girlfriend at the time, J.D., had broken up that same night. Andrew and Kendyl had attended a different party at Ewing's home during which a man displayed "a large pill bottle" and Ewing said something like, "'Put it away. We don't need to see that.'" Andrew said that those events made Kendyl nervous about something being put into her drink, so she left the party and went home. After Ewing's arrest, Ewing told Andrew that on May 5, 2016, "he got drunk, he passed out[,] and he only remembered sleeping."

Justin Wilcox told Malick that he and Nick Howerton were at Ewing's house on May 5, 2016, and they left between 2:30 and 2:45 a.m. Wilcox saw J.M. at the party, and he asserted that Ewing was not drunk when Wilcox left. Adam McKenna told Malick that he had attended a party at Ewing's house in 2016 at which he believed someone had drugged his drink; he drank a couple of sips of wine and then felt "as if he had drank 15 beers." McKenna also said that at that party he had heard Wilcox and Jordan Mick joking

8

about putting a "Mickey" in someone's drink. McKenna further described a birthday party for him that was held at Ewing's home in January 2016 and was attended by Ewing, McKenna, Mick, Wilcox, and two women, A.L. and E.H, among others. Based on her supposed attendance at McKenna's birthday party, Malick asked A.L. to come to the sheriff's department for an interview.

During that interview on August 9, 2016, A.L. told Malick that Ewing had raped her at his home in 2015. A.L. had gone to Ewing's house, and she only wanted to lie in bed and cuddle, even though she knew from past experience that cuddling "always led to something else." Ewing tried to pull her pants off and she struggled, trying to keep them up; she told Ewing that she did not want to have sex, using the words "no" and "stop." Ewing pulled off her pants, rolled her onto her stomach, held her hands behind her back, and forced a 12-to-16-inch "jellylike" dildo into her anus. Crying, A.L. told Ewing it hurt, but he did not stop. She managed to get free and crawl toward the door but Ewing dragged her back to the bed by her hair and penetrated her vagina and her anus with his penis. A.L. cried throughout most of the events and, afterward, she was extremely sore and "might have had some bruises." She said that she reported the events to her sister and perhaps her grandmother, but not to law enforcement. A.L. also described other parties she had gone to at Ewing's home, including one she went to with Mick after Ewing raped her. At that party, A.L. saw E.H. "[u]nable to walk without running into chairs or walls."

When McManigal later interviewed C.S., A.L.'s mother, she stated that after A.L. returned from her interview with Malick, she told C.S. that she had gone to Ewing's home in late 2014 or early 2015 and he had given her wine that made her "feel really tired." A.L. said that she had made it to the couch and lain down, but woke up later in Ewing's bed. She stated that she felt like she could not move her arms or legs and that Ewing had her pinned down and was raping her. A.L. also told C.S. that at some point, she crawled away from the bed, and Ewing grabbed her and threw her back on the bed.

9

*Criminal prosecution and pretrial rulings*

On May 27, 2016, the State filed a complaint in case No. 16CR195 charging Ewing with one count of rape of J.M., one count of aggravated criminal sodomy of J.M., one count of attempted aggravated criminal sodomy of J.M., one count of misdemeanor possession of marijuana, one count of misdemeanor possession of drug paraphernalia, one count of misdemeanor unlawfully hosting minors consuming alcoholic liquor or cereal malt beverage, and one count of furnishing alcoholic liquor to a minor. It later amended the complaint to add a count of misdemeanor battery of J.M. and to change the charge of attempted aggravated criminal sodomy to one of aggravated criminal sodomy.

On June 10, 2016, the State filed a complaint in case No. 16CR203 charging Ewing with one count of rape of M.W., one count of aggravated criminal sodomy of M.W., and one count of battery of M.W. The State later amended the complaint to add an additional charge of aggravated criminal sodomy of M.W. Ewing pled not guilty to all charges in 16CR195 and 16CR203. Ultimately, the investigation into Ewing resulted in a total of six criminal cases being filed against Ewing: 16CR195, 16CR203, 16CR212, 16CR244, 16CR297, and 16CR336.

On August 18, 2016, J.M. testified at the preliminary hearing in 16CR195 and, during direct examination, she apparently "space[d] out" and became nonresponsive to questioning. Later in the hearing, J.M. stated that she suffered from anxiety and depression, she had been diagnosed with dissociative disorder, and she "spaced out" frequently; she said she had spaced out during her rape and "[p]robably" while talking to law enforcement.

Meanwhile, the investigation continued. Malick interviewed Jesse Cannon, who had grown up around Ewing and, at times, was friends with A.L. Cannon provided Malick with copies of text messages dated September 14, 2016, in which A.L. referred to

10

her sexual assault and stated that she did not consider what happened to her in 2015 to be rape because she had voluntarily gone to Ewing's home. In one of the texts, A.L. stated that she went to his house knowing she would have sex with him. In addition, Cannon provided text messages from M.W. sent after Ewing was charged with crimes against her that referred to her "brutal[]" assault by Ewing.

On February 14, 2017, the State moved to consolidate the six criminal cases it had initiated against Ewing. Ewing opposed consolidation, and the motion to consolidate was denied at a February 17, 2017 hearing. Six days later, the State filed a motion requesting consolidation of the six criminal cases under the statutes related to compulsory joinder. The district court heard additional argument on consolidation at a March 15, 2017 hearing, after which it consolidated some of the cases, but not all of them. As germane to this appeal, the district court consolidated 16CR195 and 16CR203 for trial.

On April 25, 2017, based upon J.M.'s behavior and testimony at the preliminary hearing, Ewing filed a "Motion for Independent Mental Health Examination of" J.M. The State opposed the motion. After hearing argument on the motion at a hearing on May 5, 2017, the district court denied the motion. At the same hearing, Ewing asked the court to sever the cases, in effect reversing the consolidation, but the district court denied his request. Also at that hearing, the State moved for admission of evidence that Ewing viewed websites that contained "violent pornography." Ewing objected, and the district court took the motion under advisement.

On June 5, 2017, Ewing filed a renewed objection to admission of pornography evidence, an objection to related expert testimony, and a motion to allow admission of evidence about prior sexual contact Ewing had with the complaining witnesses and other witnesses for the State. At a hearing the following day, the district court ruled that the State could enter into evidence excerpts from pornographic videos if the excerpts contained only acts similar to those of which Ewing was accused. After sealing the

11

courtroom, the district court heard argument regarding Ewing's motion to admit evidence of prior sexual contact, and it denied the motion with respect to prior sexual contact with M.W. and J.M. but left open the admissibility of similar evidence about other witnesses.

*Jury trial*

The five-day jury trial began on June 26, 2017. Ewing filed a "Renewed Objection to Admission of Pornography Evidence and Request to Restrict Use During Opening Statements." After voir dire concluded, the district court overruled the objection.

Testimony in the jury trial began on June 27, 2017. Over the following two and a half days, the State presented the testimony of Dunn, Malick, McManigal, and Santa as set forth above, and the State also presented the testimony of Jackson County Sheriff's Deputy Cecil Mercer, who had cleared the firearms found in the search of Ewing's home. In addition to the facts set forth above, McManigal testified regarding his review of the voluminous records from Ewing's Facebook account. He testified that there was a common theme in the way Ewing contacted women: he would initiate contact by sending a message that simply said, "'Hey.'" If he got a response, he made small talk and invited them to his home. Over 60,000 pages of Ewing's Facebook records were admitted into evidence at trial. T.H. testified that on May 5, 2016, she had exchanged Facebook messages with Ewing, sending him nude pictures of herself.

J.M. testified for the State. Because her testimony varied slightly from her initial statement to Dunn, it is related here in detail. On the evening of May 5, 2016, Ewing invited J.M.—through Facebook—to come over and hang out with him and some of his friends. Ewing agreed to give her gas money, and she planned on spending the night at Ewing's home, but she did not plan to have sex with him. She arrived at Ewing's at approximately 10 or 11 p.m. and found Ewing, Wilcox, and Miguel Treo playing a drinking game; J.M. got a beer, drank it, and watched them play. Other males whom J.M.

12

did not know came and went throughout the evening. At about 11:30 p.m., J.M. went to Ewing's bedroom and changed into sweatpants and a tank top that she had brought with her, but after watching the game for a while longer, J.M. got tired. The other people there were starting to leave, so she went upstairs to Ewing's bedroom to go to sleep.

Ewing came to the bedroom, turned on the television, lay down on the bed, and began "grabbing for [her] shirt." J.M. told him she did not want to take her shirt off, and Ewing said, "'Take it off or you're leaving.'" J.M. testified that she felt she could not leave because she did not have enough gas to make it home and she was uncomfortable driving at night. J.M. told Ewing again that she did not want to take her shirt off and that she just wanted to talk. J.M. wanted to know if Ewing had a girlfriend, and she wanted to ask him why he had been inconsistent in his behavior toward her. Ewing said, "'Take it off and then we can talk.'" J.M. removed her tank top; she was not wearing a bra. They began to talk, but Ewing grabbed her sweatpants and tried to take them off. J.M. resisted, pulling her sweatpants back up and trying to get off the bed, but Ewing forcibly removed J.M.'s sweatpants and her underwear, ripping her underwear as he did so.

J.M. testified that Ewing grabbed her by her hair and put his penis in her mouth. When J.M. tried to scrape him with her teeth, he hit her in the head and said, "'Do it right.'" He repeatedly told her to say that she "wanted his dick," and J.M. did so because he hit her several more times. When J.M. gagged, Ewing told her to breathe through her nose. He then took his penis out of J.M.'s mouth, turned her onto her stomach, and put his penis in her vagina. Crying, J.M. said she did not want to do that. Ewing did not answer, but he tried to put his penis in her "butt"; J.M. struggled and said, "'No.'" Despite saying that he would not put his penis in her anus, Ewing did so. Ewing then lay on his back and, still holding J.M.'s hair, he put his penis back into her mouth. When J.M. again tried to scrape his penis with her teeth, Ewing hit her again and then appeared to pass out—he closed his eyes and began snoring.

13

J.M. got up, grabbed the items she had brought with her, and left the house. She heard a constant ringing in her left ear, where Ewing had hit her. She sat in her car and went through her phone "trying to figure out what to do." She remembered that Sanson lived in Holton, and she found his address in her cell phone. While trying to locate Sanson's home, she called Stephanie, crying, and told her what had happened. When J.M. arrived at Sanson's home, which was about two blocks from Ewing's, she told Sanson what had happened, and he convinced her to call 911 and report the events.

During her trial testimony, J.M. acknowledged that she went home, slept, and helped her grandfather prior to going to the hospital for a sexual assault examination. She also acknowledged that despite being told it might destroy evidence, she had showered, eaten, drank fluids, and gone to the bathroom prior to going to the hospital, "[b]ecause I don't like going places without showering, and it was really hot outside and I was standing outside helping my grandpa, and then kind of like you can't hold—didn't go to the bathroom too long." On cross-examination, J.M. was shown a transcript of a prior hearing, after which she admitted that she had initially reported that Ewing had only *attempted* to penetrate her rectum. J.M. previously testified that she only came to believe that Ewing actually penetrated her rectum when the SANE said she had lacerations there.

As to the lasting physical effects of the assault, J.M. testified that the ringing in her ear lasted "[a] few days and then it went away and then . . . it would come back and then now it's just like—it sounds like there's constantly cicadas in my ear." J.M. also stated that she underwent memory testing by a neurologist after having memory problems that she had not experienced prior to the events with Ewing. On cross-examination, J.M. also testified that several years prior to the events with Ewing, she had seizures as a result of a different illness. She also acknowledged that she had spent time with Ewing prior to May 5, 2016, and had spent her 18th birthday at his house.

14

To corroborate J.M.'s story, the State presented testimony from Stephanie, Sanson, and Harris, as set forth above. The State also called J.D., who testified that she had told law enforcement that Ewing had broken up with her because of her unwillingness to participate in certain sexual activities. Specifically, Ewing continued to try to have anal sex with her despite her repeatedly telling him she would not. She also testified, however, that Ewing never forced her into any sexual acts, he never hurt her physically, and she didn't know Ewing "as [the] kind of person" who would do the things of which he was accused.

M.W. also testified for the State, relating her own sexual assault by Ewing. Her trial testimony was substantively consistent with the facts set forth above, and her memories remained unclear. She acknowledged that she had dated Ewing prior to her assault. Specifically, she stated that on the night she was raped, she "was not in control of [her] emotions or [her] thoughts"; she "was able to move," but her "body [felt] really heavy and . . . everything was so fuzzy"; and she "was blacking in and out." In the past, she had been able to "drink a lot and not feel a thing," and she had never felt this way before. For example, she remembered the movie Old Yeller being on the television, but she did not remember at which point in the evening it was on. When asked what she did remember, M.W. testified:

> "I remember—I remember more feelings than what—actually seeing anything. I remember more like—I remember feeling the carpet under my fingernails and the pain in my ass and I remember saying and screaming, 'Ow, ow, ow,' and he just wouldn't stop. I remember saying, 'No,' and I remember my body just feeling like I couldn't go anywhere. And I think that's because he was holding onto me so hard, because I remember feeling the pressure on my sides of his hands.
>
> "And I remember, after he was done, I was standing in the bathroom looking in the mirror, and I could just see the scaredness [*sic*] in my eye just looking back at me, and I had blood trickling down my leg [from my rectum] and so I wiped it off with—with toilet paper and flushed it down the stool. And I was just looking at my face and how my

15

makeup was all over my face and my hair was all crazy and he came in and he said—he wound up saying, 'It's okay,' and he had his hand on my shoulder and was kind of rubbing my arm.

"And I turned around and he grabbed my hand, and it was like the same man that ruined me was comforting me, and I followed him back to the living room and he—then I remember being on the couch and giving him oral, which is disgusting, and then having vaginal sex with him afterwards, and next thing I remember was waking up the next morning."

When she woke up the next morning, she was in Ewing's bed, naked, and she was "mortified and trying to figure out what had happened." She went to the living room, got her clothing, put it on, and left. M.W. stated that before she went to Ewing's house in September 2014, she was not injured, but when she was getting dressed at Ewing's house and when she looked at her body afterward, she "had bruises up and down [her] legs and [her] sides and the back of [her] lower back on [her] sides. And [her] bottom . . . was in a lot of pain and [she] had [what she thought] was carpet burn on [her] face." She got into her car and drove home, where she found her mother, Misty, and Jaelyn.

M.W. took a picture of herself that day with her phone after she got home, and Misty took pictures of her body. M.W. asked Misty to keep the pictures "in case I ever decided that I was strong enough to come forward and I knew exactly what I needed to say, because everything was—some things were so blurry. I—I didn't want no one to believe me and go through all of it for nothing." Approximately a year later, M.W. asked Misty for the pictures, and she sent them to Dunn. The pictures were introduced into evidence.

M.W. testified that after she got home, Ewing sent her a text, asking why she had left. She replied:  "'Last night was too much for me,'" and "'You raped me.'" He replied to the effect of "'No, I didn't. We had sex afterwards.'"  M.W. testified that Ewing "kept denying it." Despite her injuries, M.W. did not want to believe that she had been raped,

16

so when Ewing asked her to return to his home, she did. M.W. testified that "he was just like a completely different person," and she was terrified of him, whereas before raping her, he had been "charming." She told Ewing that she believed him, then left.

M.W. testified that she had a medical history of stomach pain from constipation and irritable bowel syndrome. After being sodomized, M.W. also began to experience rectal prolapse, which occurs when the rectum telescopes out of the anus. M.W. testified that "in [her] right mind," she would "never" have consented to oral sex with Ewing, she "[a]bsolutely" did not consent to anal sex, and she did not consent to vaginal sex. She believed that she had been drugged, although she had not seen anyone put anything in a drink, and she testified that after her assault, her current boyfriend told her that Ewing drugged people with ketamine. M.W. reviewed Dunn's report of his interview with her, and she stated that it incorrectly recorded her identifying another individual as the person who had told her that Ewing used ketamine. She conceded that at the time of the assault, she was on depression medication and she was not supposed to drink, but she "did [it] all the time and it never affected" her.

To corroborate M.W.'s allegations, S.W., Misty, Mikela, and Jaelyn testified. There were some inconsistencies between the witnesses' testimony—notably S.W.'s testimony that when M.W. arrived home from Ewing's house, M.W. said she was "sodomized," in contrast to M.W.'s testimony that she did not use that word—but largely the testimony set forth the facts as related above.

Dr. Lina O'Brien, M.D., also testified. O'Brien, a colon and rectal surgeon, saw M.W. twice in October and November 2016 for rectal prolapse, which M.W. stated had been occurring since April or May of 2015. M.W. also said she was afraid to have bowel movements because it reminded her of being sodomized. Based on M.W.'s history and conversations during their initial appointment, O'Brien "felt . . . that there could be a relationship between" M.W.'s being sodomized and her rectal prolapse. On cross-

17

examination, O'Brien acknowledged that M.W. had suffered bowel problems since age 15, and long-term constipation and straining to have a bowel movement could also cause rectal prolapse. Although O'Brien testified that rectal prolapse resulting from chronic constipation "usually [resulted from] decades of chronic constipation," she conceded that chronic constipation "could have" caused M.W.'s rectal prolapse.

A.L. testified for the State as well. Her testimony was much more detailed than Malick's testimony about his interview with A.L., so it is set forth in detail here. According to A.L., she first met—and had sex with—Ewing while visiting family in Holton in 2013 when she was 16 or 17 years old. In 2014, A.L. moved to Holton and again had vaginal sex with Ewing, which she described as consensual, but "just a little forceful." According to A.L., their consensual sex involved "play wrestling" and it was "normal" for her to say no to Ewing.

The third time A.L. had sexual contact with Ewing was in 2015. On that occasion, Ewing invited A.L. to his house, and she told him that she did not want to have sex with him. He replied that it was okay, and they could just watch movies. They went and rented a movie and then returned to Ewing's home. After watching the movie for "a little bit," Ewing started to pull off A.L.'s clothes. A.L. tried to pull her pants or shorts up, but Ewing removed her pants and underwear and, without her consent, forced his penis into her vagina, her mouth, and her anus. A.L told him "no" and told him to stop, but he would not. He also inserted a 12-to-16-inch dildo into her anus. He held her hands behind her back and bruised her thighs with his hands. A.L. did not immediately report her attack to the police; she blamed herself for what had happened because she willingly went to Ewing's house.

A.L. testified that in January 2016, she went with Mick to a party at Ewing's home, at Mick's invitation, although she told Mick she did not want to be left alone at the party. A.L. had brought a bottle of wine to the party, which Ewing opened for her. She

18

drank the entire bottle of wine, and she felt "[a] little bit" like she had been drugged. For example, she could not walk even though she had drunk a bottle of wine before and not been so affected.

A.L. believed that Ewing—or maybe someone else—helped her into a room, where she lay down on a bed and could not move. A.L. had trouble remembering what had happened; she described it as "kind of all . . . a blur." She did remember that McKenna came into the room, lay beside her on the bed, and tried to put his hands down her pants. After A.L. told him no "a few times," he stopped. The next thing A.L. remembered was walking out of the room and into the kitchen, where she told Ewing, Mick, and Wilcox what had happened. The three men said "sorry" and "comforted" A.L. At that point, A.L. went to the Lemons' house, where she felt safer, and went to sleep. Early the following morning, she returned to Ewing's home and ate breakfast, and then Mick drove her home.

On cross-examination, Ewing introduced into evidence a text conversation A.L. had with Cannon in which she stated: "I went over there knowing I was going to have sex with him. So I don't call that rape." A.L. also acknowledged that when she went to speak to the police, she did not initially volunteer that she had had sexual contact with Ewing, and she told Malick that she did not know if she had bruises after Ewing raped her because she had not looked. Regarding the January 2016 incident with McKenna, A.L. acknowledged that she had originally told Malick that she did not remember being in the small bedroom with McKenna.

The State also called several of Ewing's friends to testify. McKenna acknowledged that he had told Malick about a party at Ewing's house at which he took a couple sips of wine and felt like he had drunk 15 beers, which made him think something had been put in the wine, but he qualified at trial that he had also told Malick "that [he] was drinking more liquor or alcohol before drinking just that wine" and that he felt "tipsy, yes, but not

19

drunk-drunk." McKenna further testified that he did not recall telling law enforcement that Mick and Wilcox had also drunk some of the wine and could barely stand up, nor did he remember telling Malick that Ewing's nickname was "poon-stabber," as Malick had testified. Rather, Ewing's nickname was simply "stabber." However, McKenna described the nickname as a joke because Ewing "stabs so much poon."

McKenna conceded that he had told law enforcement that he had heard Wilcox and Mick joking about slipping Mickeys into drinks, but he testified at trial that he did not actually remember them doing so. However, he also testified to the contrary, stating that he *had* heard them making such jokes. Similarly, McKenna first unequivocally testified that he had no information that Mickeys or other date rape drugs were ever put into alcohol at Ewing's house, but when confronted with Malick's report of his interview with McKenna, McKenna conceded that he had said that he believed someone had slipped something in E.H.'s drink. However, he testified that he had no information indicating that Ewing had ever raped or sodomized his accusers, and he felt that law enforcement, in his interview, had tried to get him to say bad things about Ewing and that the ensuing report of that interview took some of his comments out of context.

Mick similarly testified that law enforcement officers had tried to get him to say bad things about Ewing, put words in his mouth, and taken things out of context. He remembered speaking with law enforcement, but he denied saying, "I promise I didn't do it," when asked about drugs in drinks; he claimed that Malick made that statement up. But he admitted saying, "Wouldn't that be a shocker," explaining it as his "[d]ark sense of humor." Mick also testified that he went to parties at Ewing's house, but he never saw or suspected that drugs were being slipped into drinks, he was never aware of a plan to drug girls and rape them, and he never saw date rape drugs.

Specifically regarding the January 2016 party to which he took A.L., Mick testified that when he invited her to go with him, she was "quite excited," she wanted to

20

go to the party, she did not indicate anything was wrong, and she did not act afraid of Ewing or like she did not want to be at the party. Mick agreed that he had told law enforcement that there was a plan to bring A.L. to the party "as Adam McKenna's birthday gift." Mick also agreed that he had told law enforcement that A.L. got drunk at the party and McKenna helped her into a bedroom, at which point A.L. "freak[ed] out" because McKenna made a move on her.

The State next called Wilcox, who had also been at the January 2016 party. Wilcox conceded that he had told law enforcement that he may have joked about slipping drugs into someone's drink, which he described as an "inside joke." However, Wilcox maintained that he had never actually slipped a Mickey in anyone's drink, he had never seen Ewing do so, and he had never seen anyone at Ewing's parties who looked like they had been drugged. Wilcox also testified that on May 5, 2016, after leaving the barbecue at the Lemons' home and returning to Ewing's home, Ewing asked him to use Facebook to invite some girls over, but he could not because he does not know any girls. Ewing used Facebook to invite J.M., who came to Ewing's home. Wilcox was "pretty drunk," but he did not remember seeing J.M. drinking and he remembered that Ewing was drinking but was not "wobbling or falling over or anything like that." Wilcox testified that J.M. went to bed by herself and, approximately one hour later, Ewing said he was tired and going to bed, so Wilcox and Howerton left.

Lane Lassiter testified next that at the May 2016 party, he saw J.M. sitting by herself and he did not see her drinking, although Ewing was drinking and Lassiter believed Ewing was "legally drunk." Lassiter disputed the statement in a law enforcement interview report that he had said that Ewing was not drunk, asserting that he had said that Ewing was "not *that* drunk." At some point, Ewing said, "'I'm tired. I'm going to bed,'" and Lassiter left.

21

Dr. Julie Allison, a psychology professor at Pittsburg State University, also testified for the State. Allison testified that victims generally know and trust their rapists and that certain characteristics—such as a victim's age, incapacitation by drugs or alcohol, or emotional fragility—"make it more likely that an attacker will succeed . . . in rape." She further testified that delayed reporting of sexual assault is very common due to victims' reluctance to report sexual assault because of the fear of being blamed, the fear of reprisal, and the stereotypes of what causes rape, and she identified factors that decrease the likelihood of reporting as including the absence of violence or if the rapist does not use a weapon, the victim's education level, and if the victim is unmarried.

Allison also testified about "piecemeal reporting," which she described as:

> "report[ing] sporadic information that may not make any sense as to why they're—they're sharing a smell that they—they smelled during the rape, that they're focusing while they're being raped on—on the sensations that are being experienced. They're not cognizant of details, so they're not going to be able to share details in the same way that we might share what happened on Christmas Eve."

She stated that it is "very typical" for victims to remember sensation-based details of sexual assault, such as "sounds, the sound of a voice, yells, feelings, smells," instead of all details, and if a person is raped while incapacitated by drugs, that person is "likely to remember very little." For a drugged victim, the process of "put[ting] the pieces together" may be lengthy or may not ever happen. Allison testified that often the information given by a rape victim in statements to law enforcement, to a nurse, at a preliminary hearing, and at a trial will not be identical because "[w]hen we recount something we tell different aspects of the situation. We—we may remember different things at different times. Different questions may be asked in different ways. We contextualize communication and, hence, the information can become different."

22

Bethe Royal, forensic scientist at the KBI Forensic Science Center, testified that she had tested a pipe seized at Ewing's home and found marijuana residue. Rachel White, another forensic scientist for the KBI, testified that she received a sexual assault examination kit, a pair of underwear, oral swabs from Ewing, and oral swabs from J.M. She detected no seminal fluid or spermatozoa on the underwear, so she looked for "touch DNA," which occurs when "an individual has simply touched an item and left behind some of their skin cells just in the process of touching that item." The waistband of the underwear "had a mixture of DNA from at least three individuals," and the major contributor was consistent with J.M.'s DNA profile. When White did additional testing targeting Y chromosomes—which are only found in males—she found a "mixed Y haplo[type]," or a mixed male DNA profile. White could not make any determinations about the minor contributor, but the major contributor to that haplotype had a DNA profile consistent with Ewing's, which White explained meant that "Ewing could be a potential contributor to that DNA that was present on the panties or, additionally, there could be other individuals who could have contributed to that as well."

On cross-examination, White agreed that touch DNA could occur if the skin cells were transferred from another item. For example, touch DNA could transfer from bedsheets to underwear if someone wearing underwear lay down on someone else's bed. White also testified that the anal swab from J.M.'s rape kit revealed only J.M.'s DNA.

Amber Cole, Senior Special Agent with the KBI's digital evidence unit, examined Ewing's cell phone. Cole testified that she found no videos on the phone that related to rape fantasy or anal pornography, nor did she locate internet history or searches for date rape drugs. However, she did find a search history of items "related to possible pornography," as well as a history of web addresses. Over Ewing's objection, a list of those web addresses was admitted into evidence.

23

Cole explained that by looking at a cell phone's web history, she could "[s]ometimes" tell how often a website was accessed, she could "[o]ftentimes" tell the time of day a website was accessed, and she could "[s]ometimes" tell the length of time for which websites were accessed, "depend[ing] on what's recorded through the application that you're using." She found no indication that the videos from the websites were saved to the cell phone, and she had no way of telling whether the individual who owned or who was holding that phone saw a specific portion of a video on the website; all she could tell was that at some point in time, the phone had accessed the website.

As its final witness, the State recalled Malick. During Malick's testimony, the State introduced portions of Ewing's Facebook records, including a conversation in which Ewing asked another individual: "'Can I trade you some tabs for green?'" Malick testified that in his experience as a law enforcement officer, "green" was marijuana and "tabs" meant "[v]arious drugs, predominantly ecstasy," which was commonly known as a date rape drug and which was the type of drug referred to by the expression "slipping [someone a] Mickey." On cross-examination, Malick acknowledged that "green" could also mean cash, "tabs" could mean Lortab or "other drugs," and he had not interviewed the person with whom Ewing allegedly had this conversation. Malick also testified that he had searched Ewing's Facebook records using the term "Do I know you?" and discovered messages to over 80 women.

Turning to the data extracted from Ewing's cell phone, Malick testified that he looked for, among other things, evidence of an interest in violent pornography. Malick testified at length about the information he gathered from Ewing's cell phone that showed it had accessed certain internet websites and specific violent pornographic videos on some of those websites. Malick described some videos and websites for the jury, and he explained that he had watched other videos and made a DVD compilation of scenes from those videos that resembled acts of which Ewing was accused. Over Ewing's objection, this DVD was admitted and published to the jury.

24

On cross-examination, Malick conceded that the videos themselves were not saved on Ewing's cell phone, and there was no evidence on the phone of search terms for rape fantasy or violent pornography. He further agreed that the data extracted from the cell phone may indicate the length of time the videos were played and that the websites did not require the videos to be played from beginning to end; rather, a viewer could watch only certain portions if he or she so wished. Also agreeing that the data might reflect a video was playing even if the web browser on a cell phone is minimized, Malick conceded that he could not be sure that the excerpts on the recording he created were excerpts actually accessed on the phone. After Malick's testimony, the State rested.

Ewing did not testify. He first called Dr. John Bernard, M.D., who had been M.W.'s family doctor and who testified that M.W. had suffered from irritable bowel syndrome "for considerable years." When Bernard saw M.W. on August 23, 2014, she complained of "depression, difficulty sleeping, cloudy thoughts, crying spells, feeling overwhelmed, irritability, tossing and turning, can't focus, [and] poor motivation." Bernard diagnosed depression and started M.W. on medication that contraindicated drinking "in excess." As of March and April 2015, M.W.'s depression had stabilized, but when she returned in July 2015 for a physical, her anxiety had increased and she told Bernard for the first time that she was having flashbacks, "vague memories," and dreams about having been drugged and raped the prior September. At a follow-up appointment, M.W. told Bernard that she had been drugged and "anally gang-raped" in September 2014. Bernard testified that date rape drugs can cause memory problems, and memories can "slowly come back." In addition, he believed it was fair to say that "as more time goes on the memories become clearer and higher in number."

Ewing next presented testimony from Dr. Jennifer L. Johnson, a SANE nurse who reviewed photographs, medical forensic reports, medical records, and initial police investigation documents related to this case. Johnson identified several things that she believed Harris had done incorrectly during her examination of J.M., including the

25

incomplete documentation of J.M.'s injuries, the failure to collect anal swabs or oral swabs, the failure to complete toxicology, the failure to discuss HIV exposure, and the failure to use certain chemicals. Moreover, Johnson testified that upon review of the relevant medical records, she did not see an injury to J.M. that was consistent with sexual assault. However, on cross-examination, Johnson acknowledged that a lack of injuries does not mean that there was no sexual assault.

Ewing's brother, Drake, testified that he did not know M.W. prior to the case, but it was possible she had been at a party at Ewing's house and Drake just did not remember her. Regarding the party prior to his leaving for the Marines, Drake said he did not drink at that party, he did not fight with anyone at that party, and he did not pour a shot for M.W. at that party.

Next, B.B. testified about the Facebook message she received from M.W. in November 2015 that she characterized as "trying to build a case" against Ewing. B.B. acknowledged that she had told police that sex with Ewing was rough and Ewing liked to pull her hair. She further testified, however, that Ewing had never hurt her and had never forced her to do anything she did not want to do. Like Mick and McKenna, B.B. stated her belief that the report memorializing her interview by law enforcement did not accurately reflect her statements. The defense rested.

On June 30, 2017, the jury found Ewing guilty on all but one of the charges, acquitting him of possession of marijuana, and convicting him of one count of rape of J.M., one count of aggravated criminal anal sodomy of J.M., one count of aggravated criminal oral sodomy of J.M., one count of possession of drug paraphernalia, one count of hosting minors, one count of furnishing cereal malt beverages, one count of battery of J.M., one count of rape of M.W., one count of aggravated criminal anal sodomy of M.W., one count of aggravated criminal oral sodomy of M.W., and one count of battery of M.W.

26

On July 14, 2017, Ewing filed a motion for new trial. The district court considered the motion at a hearing on July 27, 2017, and ultimately denied it. On September 1, 2017, the district court sentenced Ewing to a controlling sentence of 18 months in county jail and 330 months in prison. Ewing timely appealed.

CONSOLIDATING CASES FOR TRIAL

On February 14, 2017, the State moved to consolidate the six pending criminal cases against Ewing for one trial pursuant to K.S.A. 22-3202(1) and K.S.A. 22-3203. K.S.A. 22-3203 permits multiple complaints against a single defendant to be tried together if the State could have brought the charges in a single complaint, while K.S.A. 22-3202(1) allows joinder of charges if crimes "are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan."

The State contended that the crimes charged in the cases against Ewing all were of the same or similar character because they all involved violent sex crimes, and all were connected and part of a common scheme or plan in which Ewing used social media to contact each of the alleged victims, he invited them to his home, he gave them alcohol, and he forcibly sexually assaulted them. The State also argued that the crimes "all represent the defendant's common scheme or plan as it relates to his view of sex."

Ewing objected to the proposed consolidation, contending that any thematic similarity could not justify consolidation. Moreover, he argued that consolidation would prejudice him by increasing the risk that the jury would use cumulative evidence to find him guilty, dislike him because of the number of charges, or be confused by the "morass of evidence." In addition, Ewing contended that consolidating the only case involving a minor victim with the other cases would be highly prejudicial due to heightened emotions about sexual crimes against minors.

27

The district court held a hearing on February 17, 2017, at which it heard argument and denied the motion. Noting that the ability to do something is different from whether one "should" do it, "[t]he court [found] that the most prudent thing to do will be to try these cases as the previous order set out in terms of an order of trial, and the motion to consolidate will be denied."

Six days later, the State filed a motion entitled "Motion for Consolidation pursuant to Compulsory Joinder." The document informed the district court that since the previous hearing, "the State has familiarized itself with another constitutional and statutory issue that deserves deep consideration by the Court in granting joinder/consolidation for each of the above cited matters[:] Compulsory joinder under K.S.A. 21-5110(b)."

K.S.A. 2018 Supp. 21-5110(b), also known as the compulsory joinder rule, states:

"A prosecution is barred if the defendant was formerly prosecuted for a different crime, or for the same crime based upon different facts, if such former prosecution:
    (1) Resulted in either a conviction or an acquittal and the subsequent prosecution is for a crime or crimes of which evidence has been admitted in the former prosecution and which might have been included as other counts in the complaint, indictment or information filed in such former prosecution or upon which the state then might have elected to rely; or was for a crime which involves the same conduct, unless each prosecution requires proof of a fact not required in the other prosecution, or the crime was not consummated when the former trial began."

In other words, "'[u]nder the compulsory joinder rule, if evidence is admitted of an offense not contained in the charge, later prosecution of that offense is barred if it could have been included as an additional count in the first prosecution.'" *State v. Jordan*, 303 Kan. 1017, 1019, 370 P.3d 417 (2016).

28

The State argued to the district court that if it did not consolidate the cases against Ewing into one trial, the compulsory joinder rule "will *severely* prejudice the State." The State argued that evidence of Ewing's alleged crimes against every victim was arguably admissible in each trial as propensity evidence, but if the State introduced evidence of one victim in a trial that did not prosecute crimes against that particular victim, the compulsory joinder rule could bar future prosecutions for those crimes. The State renewed its arguments that the cases were statutorily appropriate for joinder and, because of the compulsory joinder rule's anticipated effect, the State asked the district court to grant its request to consolidate.

The district court held a hearing on March 15, 2017, at which the State acknowledged that if the district court denied consolidation, the State could dismiss the cases and refile all charges in a single case. After hearing argument, the district court stated, "I don't think there's any question that 'the same or similar character, mode, evidence' fits for" the four cases that charged the rape of an adult in Ewing's home, charged sodomy, and did not charge attempted rape. Thus, the district court consolidated those to be tried as two trials; 16CR195 and 16CR203 were consolidated for a single trial that led to the present appeal.

In a written journal entry issued two days later, the district court noted that "[i]t is not uncommon for a District Court to reconsider consolidation." It then analyzed whether the compulsory joinder rule would likely prevent later prosecutions, noting that evidence introduced at trial "is not entirely under the control of the prosecution and cross[-]examination may result to [*sic*] putting all the elements of a crime on the table." The district court continued:

> "Certainly, given the amount to [*sic*] 60-455 evidence available in these cases it is
> possible that beyond a reasonable doubt evidence could be introduced at the first trial of
> other scheduled trials. The prosecution to a great degree and the defense to a lesser

29

degree can control what they offer as evidence. It becomes a strategic decision for the parties."

The district court then explained its decision to consolidate 16CR195 and 16CR203 for trial, to consolidate two of the remaining cases for trial, and to order the final two cases to be tried separately. Ewing filed a renewed objection to the consolidation, which was overruled, and he raised the issue in his postconviction motion for new trial, which was also denied.

Ewing now argues that the district court erred by reconsidering its denial of the State's first motion to consolidate and by granting consolidation when the only change since the denial was the State's realization that its strategic decisions could have serious consequences under the compulsory joinder rule. Ewing asserts consolidation was granted solely "to benefit the State's strategic position" and, as such, it was "inherently unfair and violated the neutral position the Court must take as regards the trial strategy and planning of the parties." Ewing also contends that the consolidation prejudiced him and that the district court's initial decision to deny consolidation was correct.

The State responds that the district court did not err by reconsidering its ruling, and its decision to grant the motion to consolidate was well within its discretion. In the alternative, the State argues that even if error occurred, the consolidation did not prejudice Ewing's substantial rights.

"Reconsideration of earlier pretrial rulings, when necessary to prevent prejudice and assure the parties a fair trial, cannot be said to be an abuse of the trial court's broad discretion." *State v. Riedel*, 242 Kan. 834, 838, 752 P.2d 115 (1988). "A district court abuses its discretion when (1) no reasonable person would have taken the view adopted by the district court; (2) the judicial action is based on an error of law; or (3) the judicial

action is based on an error of fact." *State v. Thomas*, 307 Kan. 733, 739, 415 P.3d 430 (2018). The party asserting the abuse of discretion must establish it. 307 Kan. at 739.

Ewing contends that the circumstances had not sufficiently changed since the initial motion was considered, but he identifies no authority that requires a quantifiable change of circumstances before reconsideration. Thus, Ewing has abandoned that argument. See *State v. Tappendick*, 306 Kan. 1054, Syl. ¶ 2, 400 P.3d 180 (2017) ("[A]n argument that is not supported with pertinent authority is deemed waived and abandoned."). In any event, we find no abuse of discretion in the district court's decision to reconsider its prior ruling on consolidation.

Turning to the merits, it appears that the district court consolidated 16CR195 and 16CR203 for trial based in part on the compulsory joinder rule, but also based on the district court's findings that permissive joinder was appropriate under K.S.A. 22-3202(1) and K.S.A. 22-3203. To the extent that the district court's ruling requires statutory interpretation of the compulsory joinder rule at K.S.A. 2018 Supp. 21-5110(b), this court exercises de novo review. See *State v. Redick*, 307 Kan. 797, 807, 414 P.3d 1207 (2018) (stating that appellate courts review statutory interpretation questions de novo). To the extent that the district court's ruling was based on permissive joinder under K.S.A. 22-3202(1) and K.S.A. 22-3203, our standard of review is as follows:

> "We review a district judge's decision to consolidate multiple cases in three steps; each step requires us to apply a different standard of review:
>> "'First, the court considers whether K.S.A. 22-3203 permitted consolidation. Under that statute, multiple complaints against a defendant can be tried together if the State could have brought the charges in a single complaint. K.S.A. 22-3202(1) spells out the three conditions permitting the joining of multiple crimes in a single complaint. Whether one of the conditions is satisfied is a fact-specific inquiry, and the appellate court reviews the district court's factual findings for substantial

31

competent evidence and the legal conclusion that one of the conditions is met de novo. Second, because K.S.A. 22-3202 provides that charges "may" be joined, a district court retains discretion to deny a request to consolidate even if a statutory condition is met. This decision is reviewed for an abuse of discretion. Finally, if an error occurred in the preceding steps, the appellate court considers whether the error resulted in prejudice, *i.e.,* whether it affected a party's substantial rights.' [Citation omitted.]" *State v. Smith-Parker*, 301 Kan. 132, 156, 340 P.3d 485 (2014).

We will first address whether the district court erred in consolidating 16CR195 and 16CR203 for trial under the permissive joinder rule. In its written journal entry, the district court noted the similarities between 16CR195 and 16CR203:  the crimes charged involved adult victims with whom Ewing had a prior sexual relationship; the charges include nonconsensual anal sodomy, rape, and oral sodomy; and the crimes took place at Ewing's residence in Holton. The district court found the crimes in the two cases to be "of the same or similar character," which is a basis for consolidation under K.S.A. 22-3202(1) and K.S.A. 22-3203.

Ewing concedes the crimes in both cases "are of [the] same or similar character," but he asserts that the "similarity is insufficient to support consolidation without further analysis." The State argues the opposite. For joinder of charges "of the same or similar character," our Supreme Court has stated: "'When all of the offenses are of the same general character, require the same mode of trial and the same kind of evidence, and occur in the same jurisdiction, . . . if separate informations have been filed they may be consolidated for trial.'" *State v. Ritz*, 305 Kan. 956, 962, 389 P.3d 969 (2017).

Here, both cases included charges of rape, aggravated criminal sodomy, and battery. The charges in both cases required trial by jury and could result in incarceration. Moreover, in both cases, the victims knew Ewing before the crimes; the crimes occurred

32

at night at Ewing's home; the victims were invited to Ewing's home by Ewing on the night the crimes occurred; both cases involved nonconsensual and forced oral, vaginal, and anal penetration by Ewing; the victims in both cases suffered physical injuries as a result of the crimes; and in both cases the victims left while Ewing was asleep. There was a substantial overlap of evidence between the two cases. Finally, Ewing did not present antagonistic defenses in the two separate cases.

Considering all these similarities between 16CR195 and 16CR203, there was substantial competent evidence to support a finding that the crimes charged in those cases were "of the same or similar character." Thus, the district court did not err in its legal conclusion that K.S.A. 22-3202(1) and K.S.A. 22-3203 permitted consolidation of 16CR195 and 16CR203.

Next, this court reviews whether the consolidation was an abuse of discretion. As the district court stated at a pretrial hearing, just because the cases could be consolidated for trial does not mean that the cases "should" be consolidated. Once again, "[a] district court abuses its discretion when (1) no reasonable person would have taken the view adopted by the district court; (2) the judicial action is based on an error of law; or (3) the judicial action is based on an error of fact." *Thomas*, 307 Kan. at 739. The party asserting the abuse of discretion must establish it. 307 Kan. at 739.

Ewing does not argue that the district court based its permissive joinder decision on an error of law or fact, and his argument that no reasonable person would have consolidated the two cases for trial is unpersuasive. As set forth above, 16CR195 and 16CR203 met the statutory requirements for joinder. Separate trials would have resulted in a substantial repetition of the evidence presented by the State and Ewing. We are unable to discern any prejudice to Ewing caused by the permissive joinder. As a result, we conclude the district court did not abuse its discretion in granting consolidation, so we need not reach the reversibility step of the analysis. See *Ritz*, 305 Kan. at 965. Because

33

we conclude the district court did not err in granting permissive joinder under K.S.A. 22-3202(1) and K.S.A. 22-3203, we need not address whether the district court erred by consolidating the cases under the compulsory joinder rule.

ADMISSION OF EVIDENCE OF PORNOGRAPHY

The admissibility of the pornographic video clips in State's Exhibit 66 was hotly contested throughout the proceedings in district court. Accordingly, we will set forth the district court proceedings related to this issue in detail.

*Pretrial proceedings related to evidence of pornography*

On May 2, 2017, the State moved to admit evidence of "the defendant's accessing and viewing violent porn where rape, aggravated sodomy and battery are reenacted." The State asserted that forensic analysis of Ewing's cell phone and computer "revealed [Ewing's] consumption of pornography that focuses on rape, aggravated sodomy and battery," and it sought "admission of only that consumption that mirrors the acts he's charged with." The State's motion included the names of nine such videos, the dates on which they were accessed, and a description of their contents.

The State's motion also identified four websites it claimed were accessed from Ewing's cell phone and/or computer and which appeared to show violent pornography. Noting that many of these accesses occurred "right before and right after many of the charges defendant faces," the State then cited Kansas caselaw that found the use of illegal child pornography "was relevant, material and probative under K.S.A. 60-455 to prove [the defendant's] preparation to engage in sexual intercourse . . . with [the minor victim] by enticing and encouraging her to participate in the sex crimes," citing *State v. Skaggs*, No. 100,201, 2009 WL 2436671 (Kan. App. 2009) (unpublished opinion), *rev. denied* 290 Kan. 1103 (2010). The State acknowledged that, unlike the situation in *Skaggs*, the

34

pornography here did not implicate K.S.A. 60-455, but the State then merely concluded: "Accordingly, the requested admission of the evidence herein is clearly proven."

In response, Ewing argued that "[t]he possession of legal pornography is not relevant or probative to the issues in this case." In support, he cited *State v. Boleyn*, 297 Kan. 610, 626-27, 303 P.3d 680 (2013), in which our Supreme Court noted that the possession of both homosexual and heterosexual pornography might show that the possessor had an interest in viewing both, "but this conclusion is a far cry from the inference that [the possessor] is exclusively attracted to or sexually active with men."

Ewing also argued to the district court that our Supreme Court reinforced this "caution[] against inferring too much about a person's actual sexual practices from the pornography he or she possesses" a year later in *State v. Smith*, 299 Kan. 962, 976, 327 P.3d 441 (2014). In *Smith*, our Supreme Court held: "If possession of homosexual pornography is not relevant to prove a person's sexual practices, [as the *Boleyn* court held,] then possession of heterosexual pornography is likewise not relevant for that purpose." 299 Kan. at 976.

The district court heard argument on the State's motion at a May 5, 2017 pretrial hearing; both parties largely reiterated their written arguments. The State described its "bottom line" as "Defendant did what he watched." Ewing argued that possession of violent pornography does not equal propensity to commit violent sex crimes. Ewing's counsel also stated that she had not viewed all the websites identified by the State, and she opined that each video the State wished to introduce into evidence should be analyzed individually. The district court took the motion under advisement.

On May 11, 2017, the State filed a statement of supplemental authority on the issue, providing six additional cases. The State also informed the district court that on March 21, 2017, Malick had discovered in Ewing's Facebook records a photograph of

35

Ewing biting a girl on her buttocks, and Malick also found out that Ewing had shared the photograph with others and used it as the wallpaper on his cell phone. Malick spoke with an underage female who said that Ewing had "told her he had seen a photograph like that on the internet and wanted a picture taken with her that was identical." The State asserted that Ewing had "demonstrated his viewing of porn ties into his actions by replicating the act of biting a female as displayed online. He has furthermore demonstrated the relevance of his internet searches by choosing sites that display males engaged in the same conduct he's charged with."

Ewing also filed supplemental briefing, reasserting that the evidence was irrelevant and highly prejudicial. Specifically, Ewing argued that, according to the State's description of the pornographic videos, they contained "extreme content" that was "not reflective of the charges against" him, including:

> "[W]omen forced to vomit and then eat the vomit; battle scenes with multiple rapes; computer-generated scenes; anilingus (female on male), latex suits, leashes and riding crops; whipping; writing degrading words on a female's buttocks; drinking urine; torture; spitting on females; forced lesbian scenes; multiple perpetrators; ejaculation on a woman's face; incest fantasy videos; [and] forced vomiting on another person."

Ewing noted that the State had provided a disc purportedly containing the downloaded videos at issue, but Ewing's counsel had been unable to access its contents. Thus, he reserved the right to make further argument after viewing the videos the State wished to admit. Ewing also pointed out that the State's representation that the videos were accessed in close temporal relation to the charged crimes was not entirely accurate because the alleged access dates were between April 4 and April 28, 2016, and some of the charged crimes allegedly occurred in September 2014, over a year and a half earlier. Finally, Ewing argued that if the pornography was admitted as propensity evidence, the State would need expert testimony that viewing violent pornography is indicative of violent sexual behavior.

36

Shortly thereafter, the State informed the district court that it had an expert witness who would testify that (1) "there is a correlation between those who consume violent porn and those who have increased hostile attitudes toward women"; (2) men who "consume more pornography are more likely to report either desiring or having engaged in" certain behaviors such as hair pulling and choking; (3) "[m]en with hostile attitudes toward women and who also have frequent casual sex are more likely to view violent pornography and to be more sexually aggressive"; and (4) such men's "acts during sexual aggression are quite consistent with those found in violent pornography."

In a written order issued on May 22, 2017, the district court noted that some of the pornography the State wished to admit "was viewed by [Ewing] within forty-five days of May 6, 2016 which is the date that the allegations in 16 CR 195 are said to have occurred," and portions of the videos showed acts Ewing was accused of doing to his victim. The district court found:

> "The relevance of this evidence could prove motive, intent, preparation, plan, knowledge or identity. (Although not a 60-455 case factors from 60-455(b) are helpful). This evidence is relevant and its probative value is not outweighed by the potential for undue prejudice. The Court finds that the different evidentiary situations in some of the cases cited by the prosecution support admission in these cases."

The district court distinguished *Boleyn* and indicated that it believed *Smith* actually supported admitting the evidence of pornography. It concluded:

> "The Court will allow the prosecution to offer redacted portions of videos depicting acts similar to the occurrences or the State may have a witness who viewed the videos describe those portions of the videos. The portions of videos depicting other acts will not be shown or discussed. Further, in the case of each video the specific date of the video and where it was located must be provided as a foundation."

On June 5, 2017, Ewing filed a renewed objection to admission of the pornography evidence, which the district court considered at a hearing the next day. Ewing argued again that the videos were irrelevant and were more prejudicial than probative. As to relevance, the district court found:

"[The videos are] not predictive. They're—where did this person get these ideas? People tend to get ideas from places. Humans are driven by ideas, and they don't always come up with them themselves, whether that's a political ideology or specific acts, and, really, that's what the State is getting at, that these acts were presented, these ideas were given to the defendant—that's the allegation—and that he then sought to act upon that, and, therefore, when these witnesses are saying 'This is what happened to me,' some of these events which would cause a normal person to recoil that any human being would consider doing that to another, the videos conform with what these witnesses are describing.

"So I think that's their relevance in this context and the fact that they're very specific. We're not talking about general videos. We're talking about some specific videos that have acts in them that are then coming out and, at least according to the allegations, in what's happening."

Ewing's counsel also conveyed her belief that the court had not reviewed the pornography and stated: "I think that it's impossible for anybody to make a relevancy or prejudicial-versus-probative analysis without having reviewed those videos, so I think that's an important issue that needs to be addressed, as to how the Court can make that ruling without actually seeing the evidence that's intended to be admitted." In response, the district court stated:

"[I]n asking for the admission of these videos, the State provided a very detailed listing of the acts that were to be committed—that were being committed on those videos. The Court made its decision based on those descriptions and that counsel, as an officer of the court, accurately described what was to be seen on those. And, for those reasons, the Court did not believe it was necessary, and, in fact, I do not have those videos, and I'm not going to log on to those websites on my personal computer in my office to view them."

38

Next, just before trial, the State moved to present Allison as an expert witness who would testify, among other things, that there is a correlation between men who consume violent pornography and men who engage in violent sexual acts with women. Although Allison was allowed to testify on other subjects, the district court excluded evidence of her opinion on the correlation between men who watch violent pornography and men who engage in violent sexual acts with women, finding that such "propensity" evidence was impermissible because the admission of the pornography evidence was "not in the context of 60-455."

On the first day of trial, Ewing filed another objection to admission of the pornography evidence. He renewed his arguments that "evidence regarding pornography sites found on [his] phone or computer is more prejudicial than probative and should not be admitted into evidence in this trial." Ewing continued:

"At the last Court hearing on this matter, the Court denied Defendant's request for the Court to review the videos prior to ruling on their admission into evidence. It was, and still is, the position of the defendant that the Court cannot determine the probative versus prejudicial value of visual evidence it has never seen. The Court stated that it would not review such 'filth' on its computer. This statement proves the defendant's position. If on one hand the Court refuses to view the evidence due to its offensive nature, how can the Court on the other hand, rule it is not more prejudicial than probative[?]"

After voir dire concluded, the district court took up Ewing's renewed objections. Ewing stated:

"I have . . . received an actual disk with small clips that the State indicates they intend to use. There's about 20 of them. Those clips focus on three different films. And I object to all of them for the reasons I've stated [to] the court, but there's one particular film that is entitled Autism Abuse, and the clips that have been provided to me are clearly of a young woman who is challenged. The video online indicates that she has autism. I think it's not clear from the video exactly, maybe, what is wrong with her, but it's clear

39

that there is emotional mental issue there, and the clips that have been called out involve some fairly strong violence to that individual.

"It is my belief, and the court's been very clear, that the purpose for letting this in is to let in evidence of acts that are similar to those of which Mr. Ewing is accused. And while I disagree with the court's prior ruling, I do respect it and I understand what the court has ruled, but I believe that goes outside that purview. This is, in my belief, a situation where they are showing—or attempting to show clips of someone who is mentally challenged being abused, and it adds an element to it that is different and outside the realm of what we're dealing with.

"There is nobody in this case that is alleged to have autism or some other similar issue that would put them in the posture of the woman that's in this video. I believe that this video, clips from it, are being put out there simply for shock value to the jury and are completely irrelevant to any of the allegations, and I would ask the court to not allow the State to use any clips from or have any reference to that video."

The State asserted that the video showed "a woman who is getting hit and raped," but that a viewer could not tell from the video whether the woman was autistic; "It's just a woman who is getting punished in a way that the defendant is charged with punishing his victims." Ewing replied that it "is clear from the video that this young woman suffers from something" and that in any event, to lay the necessary foundation for the video, its title would be identified. The district court ruled:

"With regard to the autism video, in the court's mind, not that autism might trigger some different kind of sympathy—although, there's a range of that. I don't know what it is, if it's a genetic thing. I'm not sure the court knows, kind of, what autism is, but it seems to me that it's not a lot different than if the woman—or women being depicted in these were African American. Are they exactly like the women that are going to testify here today? No. And whether that was any other ethnic group, that would be different.

"Autism, or if it—if the person had a broken leg, what's been proffered is that the acts that he's accused of doing are being recreated in here. So, just based on the autism title or the implication that the person has autism, that—the court's not going to alter its view of allowing that."

40

*Evidence of pornography admitted at trial*

Malick was the State's final witness during the jury trial. He testified that he examined data extracted from Ewing's phone, including the phone's internet history, looking for any interest in violent pornography. Malick found websites that had been viewed on Ewing's cell phone, he could tell that the websites had been accessed, and he could tell the dates on which they were accessed. Specifically, Malick testified that he found the website "www.xvideos.com," from which users could access many videos. The cell phone's internet history showed that it had accessed a video entitled "Pimp works over one of his hoes and she takes a rough and mean pounding" on April 4, 2016. Malick, who had watched the video, described it for the jury as "show[ing] a female in the video that was slapped multiple times, arms pulled behind her while she was bent over, forced oral sex, rough sex from behind, pulling hair and the victim choking several times."

Ewing's phone also showed an internet history involving other videos from xvideos.com, including one entitled "Fist-fucked and double-donged for days," which was accessed on April 25, 2016. Malick described that video as showing "choking women, girl face down restrained, choking and slapping her, spanked repeatedly, slapped, grabbed, restrained, forcing a dildo into the girl's mouth." He testified there were five other videos that Ewing's phone showed were accessed. On April 9, 2016, the cell phone accessed the video "Christie Wett, Prison Story," and, from the website "efukt.com," the phone accessed: "Too drunk to fuck" and "Drunken sex gone wrong" on April 12, 2016; "autism abuse" on April 23, 2016; and "I love rough porn" on April 28, 2016.

Malick watched all of those videos and "redact[ed] out only what the defendant is accused of," with the result being the disc identified as State's Exhibit 66. The State moved to admit State's Exhibit 66, and Ewing objected as irrelevant and overly prejudicial. The district court overruled the objections, admitted the exhibit, and State's Exhibit 66 was played for the jury.

41

State's Exhibit 66 contains 29 video clips, ranging in length from 3 seconds to 57 seconds. The footage contains profoundly disturbing images, including penile penetration of a female who is unconscious and drooling, men slapping women in the face during sex acts, women screaming and repeating the word "no," and a man straddling a woman's shoulders with his penis projecting over her face while he laughs and talks about a unicorn. After State's Exhibit 66 was published to the jury, Malick testified that the videos themselves were not found on Ewing's cell phone and that the data extraction from Ewing's phone did not show the entry of search terms related to rape fantasy or violent pornography.

On cross-examination, Malick acknowledged that cell phone data sometimes suggests how long a video is played on the phone, and the data from Ewing's cell phone showed that "Hood pimp works over one of his hoes and she takes a rough and mean pounding" was accessed for only 2 seconds. Malick also acknowledged that he had no way of knowing whether the portion of each video in State's Exhibit 66 was actually viewed on Ewing's cell phone; the websites allowed viewers to watch any portion of the video. Malick testified: "I can't tell you what section of the video was watch[ed] or was not watched."

For example, the video titled "Christie Wett, Prison Story" was about 17 minutes long. Acknowledging that if a web browser is minimized on a phone but is still operating in the background, the data might reflect that the video was still playing, Malick stated that the data from Ewing's phone showed that less than a minute after "Christie Wett, Prison Story" was accessed, a text message was sent from the phone. Malick again conceded that he could not say with any certainty whether the footage shown on State's Exhibit 66 from "Christie Wett, Prison Story" was actually accessed and watched on Ewing's cell phone. Similarly, the video titled "Fist-fucked and double-donged for days" was 26 minutes long, and Malick had not examined Ewing's phone's data to see how much of that 26 minutes was watched.

On redirect, Malick testified that "violentclips.com" was advertised as "the most extreme, brutal porn online and contains titles such as, 'Cutie gets her ass shattered,' and 'Take that, bitch,'" and "Honeystube.com" was advertised as "'Your one-stop shop for all abuse porn needs.'" Upon concluding Malick's testimony, the State rested.

After the jury convicted him, Ewing moved for a new trial, arguing that the district court erred in allowing the State to play State's Exhibit 66. The district court considered that motion at a hearing on July 27, 2017. Ewing argued that State's Exhibit 66 was irrelevant and was more prejudicial than probative. Ruling from the bench, the district court denied Ewing's motion for a new trial.

*Did the district court err by admitting State's Exhibit 66?*

On appeal, Ewing again contends that the district court erred by admitting State's Exhibit 66 because it was irrelevant and, even if relevant, it was more prejudicial than probative. Ewing also contends that the district court erred by refusing to review the exhibit before ruling on its admissibility. Finally, Ewing argues that even if State's Exhibit 66 were admissible with relation to 16CR195, it was not relevant to 16CR203, so the district court erred in admitting it in this joint trial.

The State responds by asserting that the district court correctly found that the video evidence was relevant and that its potential prejudicial effect did not outweigh its probative value. The State urges this court to decline to consider Ewing's arguments about the district court's failure to review the videos before trial, asserting that this argument is raised for the first time on appeal. Finally, the State contends that any error that may have occurred was harmless.

"'A district court's decision to admit or exclude evidence is assessed using a three-step standard of review. First the court addresses whether the evidence in question

43

is relevant. Relevant evidence is that which has "any tendency in reason to prove any material fact."

> "'Relevance has two elements: probative value and materiality. Evidence is probative if it furnishes, establishes, or contributes toward proof. Probativity is reviewed for abuse of discretion. Evidence is material if it tends to establish a fact that is at issue and is significant under the substantive law of the case. Materiality is reviewed de novo. Second, the court reviews de novo what rules of evidence or other legal principles apply. Finally, the court applies the appropriate evidentiary rule or principle. Review of the district court's application of evidentiary rules depends on the rule applied.' [Citations omitted.]" *State v. Thurber*, 308 Kan. 140, 191, 420 P.3d 389 (2018).

We will first address the State's preservation claim. The State contends that Ewing's arguments about the district court's failure to review the videos before trial is being raised for the first time on appeal. This preservation argument is belied by the record, as easily seen from the facts set forth above. At trial, Ewing objected to State's Exhibit 66 by stating: "Same objections I previously made as to relevance and prejudicial value, Your Honor." The objection based on prejudicial value incorporated Ewing's prior repeated arguments that the judge could not weigh the probative value of the evidence against its prejudicial effect without viewing the evidence himself.

The record shows that neither the district court nor the State clearly articulated the rationale for finding State's Exhibit 66 was relevant. At different points, the State offered the following relevance arguments: the pornography "mirrors the acts he's charged with"; "Defendant did what he watched"; Ewing "demonstrated the relevance of his internet searches by choosing sites that display males engaged in the same conduct he's charged with"; and "there is a correlation between those who consume violent porn" and those who engage in violent, sexually aggressive acts.

For its part, the district court found that Ewing accessed the videos around the time of the acts charged in 16CR195, and State's Exhibit 66 showed acts like those of

44

which Ewing was accused. The district court noted that State's Exhibit 66 did not fall under K.S.A. 60-455, but even so it found that "[t]he relevance of this evidence could prove motive, intent, preparation, plan, knowledge or identity." The district court also identified the relevance as being "these ideas were given to the defendant . . . and . . . he then sought to act upon that, and, therefore, when these witnesses are saying 'This is what happened to me,' . . . the videos conform with what these witnesses are describing."

The most reasonable interpretation of the district court's statements is that it found State's Exhibit 66 relevant to show that Ewing did the acts of which he was accused. The probative value of State's Exhibit 66 on this point is seriously undermined, however, by Malick's testimony that there was no evidence showing that Ewing actually viewed the video footage in State's Exhibit 66. To be clear, the State presented no evidence at trial of pornography that was found on Ewing's computer or phone. Instead, Malick testified that he examined the internet history on Ewing's phone and found pornography websites that had been accessed from the phone. Malick then watched all of the videos accessed from the phone and redacted portions of each video that he believed showed "what [Ewing] is accused of." As Malick candidly testified on cross-examination: "I can't tell you what section of the video [Ewing] watch[ed] or was not watched." Thus, even if the State's rationale is sound—that the viewing of violent pornography is relevant to showing that an individual committed acts like those depicted therein—there simply is no evidence that Ewing viewed the portions of the videos containing acts like those of which he was accused.

This problem was compounded by the district court's exclusion of Allison's expert testimony on the correlation between men who consume violent pornography and men who engage in violent sexual acts with women. The district court excluded this testimony, finding that such "propensity" evidence was impermissible because the admission of the pornography evidence was "not in the context of 60-455." But without evidence showing that a person viewing violent pornography has an increased likelihood

45

to commit violent sex crimes, State's Exhibit 66 had little, if any, probative value about whether Ewing committed the violent sex crimes charged.

Next, as Ewing pointed out in district court and he reasserts on appeal, one of the videos depicted in State's Exhibit 66 was entitled "Autism Abuse." The title of the video was clearly depicted for the jury to see, and the video showed graphic sexual acts involving a woman who is purportedly autistic. But there was no evidence at trial to indicate that either J.M. or M.W. were autistic. As a result, it is clear that this particular disturbing video had no probative value to prove the charges against Ewing.

Even assuming that State's Exhibit 66 was relevant, the question remains whether the probative value was substantially outweighed by the potential for undue prejudice, which this court reviews for abuse of discretion. See K.S.A. 60-445; *State v. Lowery*, 308 Kan. 1183, 1226, 427 P.3d 865 (2018). "A district court abuses its discretion when (1) no reasonable person would have taken the view adopted by the district court; (2) the judicial action is based on an error of law; or (3) the judicial action is based on an error of fact " *Thomas*, 307 Kan. at 739.

The district court here did not engage in a detailed prejudice analysis about State's Exhibit 66; it simply found: "This evidence is relevant and its probative value is not outweighed by the potential for undue prejudice." By declining to view State's Exhibit 66 prior to so ruling, the district court rendered itself incapable of fully appreciating and resolving Ewing's prejudice argument. It stands to reason that one cannot accurately judge the prejudicial effect of a violent pornographic video without viewing it. The district court's apparent reluctance to preview State's Exhibit 66 and its comments on the distasteful nature of the pornography supports the idea that undue prejudice was possible.

Unlike the district court, we have reviewed the contents of State's Exhibit 66 in its entirety. The exhibit includes video footage of graphic sexual acts, including some of

46

which Ewing was not accused, such as the sexual acts involving a woman who is purportedly autistic. Evidence that purports to show the sexual abuse of an autistic woman is irrelevant to any material fact at issue, and it merely serves to inflame the jury by implying that Ewing was sexually aroused by the abuse of a vulnerable individual.

Similarly, some of the degrading acts portrayed in State's Exhibit 66, such as the man straddling a woman's shoulders with his penis protruding over her face while he makes comments about unicorns, are in no way related to acts Ewing was accused of doing in these cases. Those portions of the video have no probative value, yet the intense negative reactions inspired by viewing the degradation and violence portrayed in State's Exhibit 66 holds an incredibly high potential for undue prejudice.

To sum up, there are four glaring problems concerning the lack of relevance and probative value of State's Exhibit 66. First, the State introduced State's Exhibit 66 without any evidence showing that Ewing actually viewed the video footage depicted in the exhibit. Second, the district court excluded the State's expert testimony that might have established that a person viewing violent pornography has an increased likelihood to commit violent sex crimes. Third, one of the pornographic videos was entitled "Autism Abuse," even though there was no evidence that the victims in this case were autistic. Fourth, the district court admitted that it never viewed State's Exhibit 66 before allowing the jury to see it, so the district court could not have possibly weighed the probative value of the evidence against its potential for undue prejudice. Based on the record presented on appeal, we have no hesitancy in concluding that the district court erred in admitting State's Exhibit 66 and allowing the State to show it to the jury.

*Harmless error analysis*

The final question is whether the admission of State's Exhibit 66 denied Ewing's due process right to a fair trial, requiring this court to reverse his convictions. In *State v.*

47

*Ward*, 292 Kan. 541, 565, 256 P.3d 801 (2011), *cert. denied* 565 U.S. 1221 (2012), the Kansas Supreme Court held that to find an error harmless under K.S.A. 60-261, K.S.A. 60-2105, and the United States Constitution, a Kansas court must be able to declare the error "did not affect a party's substantial rights, meaning it will not or did not affect the trial's outcome." The party benefiting from the error always bears the burden of proving it harmless under this standard. See *State v. Logsdon*, 304 Kan. 3, 39, 371 P.3d 836 (2016). The level of certainty by which a court must be convinced depends upon whether or not the error implicates a federal constitutional right. *Ward*, 292 Kan. at 565.

Where an error implicates a statutory but not federal constitutional right, the party benefiting from the error must persuade the court that there is no reasonable probability that the error affected the trial's outcome in light of the entire record for it to be deemed harmless. *State v. McCullough*, 293 Kan. 970, 983, 270 P.3d 1142 (2012). When an error infringes upon a party's federal constitutional right, a court will declare a constitutional error harmless only where the party benefiting from the error persuades the court "beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, proves there is no reasonable possibility that the error affected the verdict." *Ward*, 292 Kan. at 569 (citing *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705, *reh. denied* 386 U.S. 987 [1967]). Ewing argues that error in the admission of State's Exhibit 66 violated his constitutional right to a fair trial, so we employ the constitutional harmless error standard.

The State argues that any error in the admission of State's Exhibit 66 was harmless because "[d]efense counsel skillfully minimized the value of the exhibit on cross[-] examination of Agent Malick, concerning what pornography, if any, Ewing actually viewed, and for how long." It is correct that Ewing's trial counsel did her best to minimize the prejudicial impact of State's Exhibit 66 through cross-examination of Malick. But in the end, the exhibit was admitted by the district court and shown to the jury without any limiting instruction as to the probative value of the evidence.

The State also argues that this case is like *State v. Miller*, 284 Kan. 682, 701-03, 163 P.3d 267 (2007), in which our Supreme Court held that an error in admitting pornographic photographs was harmless. But in *Miller*, defense counsel cooperated with the State to select the later-challenged evidence; here, Ewing repeatedly objected to its admission. 284 Kan. at 703. Also, in *Miller*, the court relied almost exclusively on the fact that "other evidence against the defendant is 'overwhelming.'" 284 Kan. at 702. The more recent instruction from our Supreme Court in *Lowery* expressly cautions against focusing a harmlessness inquiry on strength of the evidence. See 308 Kan. at 1211.

In any event, despite the strength of other evidence against Ewing, the prosecutor referred to the State's evidence of pornography in State's Exhibit 66 at least three times in her initial closing argument:

- "[J.M.] remembers the defendant saying, 'Do it right or I'll hit you again.' Remember the porn videos? In one of them she's getting hit and the man is saying, 'Breathe, bitch, breathe.' There's a common theme between what the defendant did and what the defendant enjoyed watching."
- "[J.M.], when she testified, was asked to put the date on a picture and [she] asked, 'What number is June?' [J.M.] is a low-functioning young woman, and the defendant likes to watch autism abuse pornography."
- "Now, folks, while the defense is telling you that the defendant did not watch those videos know this, the evidence shows differently."

We note that although the prosecutor referred to J.M. as a "low-functioning young woman," there was no direct evidence to support this conclusion presented at the trial. Finally, the prosecutor discussed the evidence of pornography in the rebuttal portion of her closing argument:

"Now, Malick told you that he found, 'Pimp works over one of his hoes and she takes a rough and mean pounding.' That's not something that people watch unless they

49

enjoy violence against women. Now, Malick told you that on the Christie Wett story the defendant watched that, he stopped what he was watching, he researched Christie Wett, she is a porn star, and then found something he liked, because he went back to the, 'Christie Wett, Prison Story,' and watched some more. 'Fist-fucked and double-donged for days,' now, the defense says this is all smoke. It's not smoke, it's evidence of an attitude of what—of how you treat women. 'I love rough porn,' yes, he does. Too drunk to fuck, yes, he does. Autism abuse, yes, he does. Drunken sex gone wrong, he sure does.

"Now, Malick found this that he picked out, he chose to watch, and it's, 'Crave the other side of sexuality.' Dominating, humiliating or forcing submissive behavior with violence, it's what these ladies have told you happened to them. Advertises the most extreme brutal porn online, his pastime; advertises, 'Your one-stop shop for all your abuse needs,' his pastime. Unconscious women being raped and sodomized is what you see and what he chose to do with his spare time. Sound familiar?

"These porn sites where rape scenes are being reenacted, women are being slapped, strangled, overpowered, having their hair pulled, their hands held behind their back and a dildo used on them, sound familiar? He chose this violent porn. The path he chose on his phone—while we might go to Neiman Marcus, while we might go to Wal-Mart, while we might go to Bing and see the daily picture, he chose paths to violent porn. Now, he did that because he watched what he did and he did what he watched. If you watch violent porn, that does not mean you rape, but if you watch violent porn and every other piece of evidence in this case is considered, then that's strong evidence of the rapes."

Considering the prosecutor's emphasis on the evidence of pornography in her closing argument, it is difficult for this court to conclude that the State has met its burden of showing that there was no reasonable possibility that the error in the admission of State's Exhibit 66 contributed to the verdict. Likewise, it is difficult for us to conclude that the State has met its burden of showing harmless error even under the less stringent statutory test. But we stop short of finding that the error in the admission of State's Exhibit 66, standing alone, constituted reversible error entitling Ewing to a new trial. Instead, we will reserve our final ruling on this subject until we address Ewing's claim that he was denied a fair trial based on cumulative error.

J.M. testified at the preliminary hearing. During direct examination, J.M. apparently became nonresponsive to questions. On cross-examination, Ewing's counsel asked J.M. about why she would not respond to some questions, and J.M. stated: "Sometimes I space out." Upon further questioning, J.M. stated that she had "always" experienced this problem, it happened to her "a lot," there were times on the night Ewing raped her that she was "spacing out," and she had "[p]robably" spaced out while talking to law enforcement. J.M. testified that she had previously seen "[a] lot of different doctors" and took "a lot of different medication" for anxiety and depression, but that she no longer needed to take the medication because "it doesn't fix anything. It just masks it."

When asked if the anxiety and depression caused her to "space out," J.M. stated that she had also been diagnosed with dissociative disorder. She used to take medication to treat her dissociative disorder, but she was no longer taking it because it did not help and she continued to dissociate while she took it. J.M. agreed that when she dissociated, "that means you have a break with reality," which she stated was what happened that day during the preliminary hearing. She also explained that during a dissociative episode, she would "just sit there," she "[s]ometimes" would not respond to others, and she would "zone out and then come back to it" and "a lot of time" would have passed. J.M. also testified that she "kn[e]w" she was in a dissociative state during part of the time Ewing was sexually assaulting her "[b]ecause [she] was just trying to think about other things."

On April 25, 2017, relying on J.M.'s behavior and testimony at the preliminary hearing, Ewing moved for an examination of J.M. pursuant to *State v. Gregg*, 226 Kan. 481, 489, 602 P.2d 85 (1979), in which our Supreme Court held that "a trial judge has the discretion to order a psychiatric examination of the complaining witness in a sex crime case if the defendant presents a compelling reason for such examination." Ewing contended that J.M.'s testimony at the preliminary hearing "demonstrates that there is a

51

serious and current concern regarding J.M.'s mental health status and her ability to testify as a competent witness." The State opposed the motion, arguing there was not a compelling reason for the requested examination.

On May 5, 2017, the district court heard argument on the motion. Relying on the dissenting opinion in *State v. Simpson*, 299 Kan. 990, 995-1000, 327 P.3d 460 (2014) (Moritz, J., dissenting), the district court identified the concern to be addressed through *Gregg* examinations as one about the complaining witness' veracity. The district court ultimately found that there was no indication that J.M.'s testimony was anything but truthful. Thus, the district court denied the motion, but it did give permission for Ewing to obtain J.M.'s mental health records.

Ewing argues that the district court abused its discretion by denying his request for a *Gregg* examination. The State takes the opposite position and argues in the alternative that any error was harmless.

> "We review a district court's decision whether to grant a psychiatric evaluation of a complaining witness for abuse of discretion.
>
> "A psychiatric evaluation of a complaining witness in a sexual abuse case is appropriate when the defendant can show the totality of the circumstances demonstrate compelling reasons for the evaluation. In determining whether compelling circumstances exist, a district court considers the following nonexhaustive list of factors:
>
> "'(1) whether there was corroborating evidence of the complaining witness' version of the facts, (2) whether the complaining witness demonstrates mental instability, (3) whether the complaining witness demonstrates a lack of veracity, (4) whether similar charges by the complaining witness against others are proven to be false, (5) whether the defendant's motion for a psychological evaluation of the complaining witness appears to be a fishing expedition, and (6) whether the complaining witness provides an unusual response when questioned about his or her understanding of what it means to tell the truth.' [Citations omitted.]" *State v. McCune*, 299 Kan. 1216, 1230-31, 330 P.3d 1107 (2014).

"A district court abuses its discretion when (1) no reasonable person would have taken the view adopted by the district court; (2) the judicial action is based on an error of law; or (3) the judicial action is based on an error of fact." *Thomas*, 307 Kan. at 739.

Ewing argues that J.M.'s "demonstrated instability [at the preliminary hearing was] such that a mental health or psychological evaluation was warranted." He further contends that the district court erred by relying on the dissenting opinion in *Simpson* to find that the focus of a *Gregg* analysis is veracity. The State responds that the district court properly considered the relevant factors and, in any event, any error in denying the motion was harmless, as Ewing was granted access to J.M.'s medical records and could have cross-examined her on her mental health status at trial had he so desired.

Ewing's argument that the district court should not have relied on the dissenting opinion in *Simpson* is persuasive but not dispositive. The narrow issue before the Kansas Supreme Court in *Simpson* was whether the district court erred by suppressing the testimony of a minor complaining witness in a sex-crimes case after the minor's mother refused to sign consent for a *Gregg* evaluation that had been ordered by the court. See *Simpson*, 299 Kan. at 993-94. The majority concluded that the State's failure to adequately develop the record prevented the court from entertaining the State's argument on appeal. 299 Kan. at 994. In her dissent, then-Justice Moritz disagreed and stated that she would overturn *Gregg*, which was based on "misogynistic and outdated notions" about the need for a psychological evaluation of a female complaining witness in a sexual offense case. 299 Kan. at 996-1000. *Simpson*'s precedential value is negligible, and there was no reason for the district court to focus on the dissent in that case.

That said, a review of the record does not support Ewing's argument that the district court abused its discretion in denying his request for a *Gregg* evaluation. J.M. expressly testified at the preliminary hearing: "I remember things when I dissociate. I'm just not focused." She also replied in the affirmative when asked, "So the things that

53

you've told the Court about happening with Mr. Ewing this night, you recall all of those events?" As the district court noted, J.M.'s dissociative disorder "didn't prevent her from giving very detailed testimony about what she said happened to her," nor did it "raise issues of a lack of veracity."

Whether the complaining witness demonstrates a lack of veracity is one of the *Gregg* factors. Moreover, we note there was corroborating evidence of J.M.'s version of the facts at trial. Also there was no evidence that J.M. had made similar charges against others that were proven to be false. Although we do not categorize Ewing's request for an evaluation of J.M. to be a fishing expedition, it appears that many of the factors that a court should consider in evaluating such a request weigh in favor of denying Ewing's request for an evaluation. See *McCune*, 299 Kan. at 1231.

Perhaps more importantly, as noted above, the district court allowed Ewing to obtain and review J.M.'s mental health records, after which Ewing did not renew his request for a *Gregg* evaluation. We presume that Ewing had all of J.M.'s mental health records by the time J.M. testified at trial, and Ewing certainly could have used those records to cross-examine J.M. on her mental health issues had he chosen to do so.

In sum, the evidence before the district court did not show that J.M.'s mental health condition caused instability that affected her ability to be a truthful witness, nor did it establish any other "compelling reason" for a *Gregg* evaluation. The district court's denial of Ewing's request for a *Gregg* evaluation was not based on an error of law or fact, and a reasonable person could agree with the court's ruling. We conclude the district court did not abuse its discretion by denying Ewing's request for a *Gregg* evaluation.

54

Ewing argues that the district court erred in admitting "records allegedly received from Facebook documenting [his] account activity" because the State failed to establish the required foundation. But Ewing has failed to preserve this issue for appeal, and he has failed to designate a sufficient record to support his claim on appeal.

Ewing correctly informs this court that he objected to the admission of State's Exhibit 119 at trial. But Ewing inaccurately describes State's Exhibit 119 as "a comprehensive download of the Facebook records of an account allegedly belonging to" Ewing. In reality, State's Exhibit 119 is a single page showing a Facebook message; it is not a comprehensive download of material. A review of the appellate record shows that the "download of the defendant's Facebook account" was State's Exhibit 122.

State's Exhibit 122 is not included in the record on appeal. The party claiming an error occurred has the burden of designating a record that affirmatively shows prejudicial error. Without such a record, an appellate court presumes the action of the district court was proper. See *State v. Sisson*, 302 Kan. 123, 128, 351 P.3d 1235 (2015).

Ewing also fails to provide a record citation to the admission of the evidence he now challenges on appeal. Supreme Court Rule 6.02(a)(5) (2019 Kan. S. Ct. R. 35) requires an appellant to provide in his or her appellate brief "a pinpoint reference to the location in the record on appeal where the issue was raised and ruled on." "[A]ppellants who have failed to comply with this rule have abandoned their issues." *State v. Allen*, 49 Kan. App. 2d 162, 167, 305 P.3d 702 (2013).

Finally, Ewing either failed to timely object at trial to the admission of the evidence he now challenges on appeal, or he objected on grounds different from what he is now arguing on appeal. In district court, Ewing objected to the Facebook evidence

based on lack of relevance, but on appeal he is arguing a lack of foundation. Appellate courts do not permit a party to object to evidence on one ground at trial and assert a different ground on appeal. *State v. Campbell*, 308 Kan. 763, 770, 423 P.3d 539 (2018).

In sum, Ewing's challenge to the admission of his Facebook records fails because he failed to lodge a timely and specific objection at trial on the same grounds he asserts on appeal, he fails to adequately brief the issue by providing required record citations, he inaccurately describes the exhibits numerically identified on appeal, and he fails to designate a sufficient record to support his claims on appeal.

ADMISSION OF EVIDENCE OF EWING'S NICKNAME

During the trial, Malick and McKenna both testified about Ewing's nickname. Ewing now contends that the district court erred in overruling his relevancy objection to this evidence. In response, the State first argues that Ewing did not properly preserve the issue for appeal by failing to object at *all* instances when the word "stabber" or "poon-stabber" appeared in testimony. The State is correct.

K.S.A. 60-404 requires a contemporaneous and specific objection to the admission of evidence to preserve the issue of admission for appellate review. It also is well-established that when evidence is admitted through several avenues, such as the testimony of more than one witness:

> "Kansas does not follow the rule that if an earlier objection is overruled, repeated objections are not required . . . . In order to raise the admissibility of evidence as an issue on appeal, the record must show a timely and specific objection. If a continuing objection is lodged, failure to object when the evidence is subsequently re-admitted does not bar raising the issue on appeal. [Citation omitted.]" *McKissick v. Frye*, 255 Kan. 566, 582, 876 P.2d 1371 (1994).

56

During Malick's testimony at trial, the prosecutor asked, "What's the defendant's nickname?" Ewing objected on relevance grounds, and the district court summarily overruled the objection. Malick then testified: "Adam McKenna indicated that [Ewing's] nickname is poon-stabber." Later during cross-examination, Malick agreed that McKenna was the person who said Ewing's nickname was "poon-stabber" and further stated that Ewing's computer revealed he had given "poon-stabber" as his "porn name" on a website. Similarly, McKenna acknowledged during his testimony that law enforcement reports conveyed that he had said that Ewing's "nickname was poon-stabber." He also testified that he remembered "telling them that his name was stabber and they called him that because he stabs so much poon." Ewing did not object during this portion of McKenna's testimony.

Ewing did not request a continuing objection when Malick first testified about Ewing's nickname. Also, Ewing did not object at all during the portion of McKenna's testimony about Ewing's nickname. Under K.S.A. 60-404, Ewing has failed to preserve this evidentiary issue for appeal.

EVIDENCE OF EWING'S PRIOR SEXUAL RELATIONSHIP WITH J.M. AND M.W.

On June 5, 2017, Ewing moved to admit evidence or testimony of a prior sexual relationship with J.M., M.W., and some anticipated witnesses for the State, pursuant to K.S.A. 2017 Supp. 21-5502. K.S.A. 2017 Supp. 21-5502(b), commonly known as the rape shield statute, states in part:

> "[I]n any prosecution to which this section applies, evidence of the complaining witness' previous sexual conduct with any person including the defendant shall not be admissible, and no reference shall be made thereto in any proceeding before the court, except under the following conditions: The defendant shall make a written motion to the court to admit evidence or testimony concerning the previous sexual conduct of the complaining witness. The motion shall be made at least seven days before the commencement of the

57

proceeding unless that requirement is waived by the court. The motion shall state the nature of such evidence or testimony and its relevancy and shall be accompanied by an affidavit in which an offer of proof of the previous sexual conduct of the complaining witness is stated. . . . The court shall conduct a hearing on the motion in camera. At the conclusion of the hearing, if the court finds that evidence proposed to be offered by the defendant regarding the previous sexual conduct of the complaining witness is relevant and is not otherwise inadmissible as evidence, the court may make an order stating what evidence may be introduced by the defendant and the nature of the questions to be permitted."

Ewing argued that the prior sexual conduct evidence was relevant (1) because the jury needed to understand "the prior relationship of the parties" to analyze properly the issues in the case; (2) because the charges that he raped J.M. were based on J.M.'s "lack of consent/overcome by force or fear," and their prior relationship was relevant to J.M.'s basis or lack of basis for her alleged fear; and (3) if Ewing decided to testify, he should be allowed to explain how the alleged victims' behavior was different or like their behavior during prior interactions.

On June 6, 2017, the district court conducted an in camera proceeding on the motion. Ewing reminded the district court that J.M.'s testimony about their prior sexual relationship included hair pulling and other rough or violent behavior and, similarly, M.W. had described her previous sexual contact with Ewing as rough. The State noted the presumption of inadmissibility that attached to such evidence and argued that Ewing wished to question J.M. and M.W. in the very way the rape shield statute was enacted to prevent. The district court denied Ewing's motion, finding (1) because M.W. alleged that she was drugged and thus could not have consented, prior sexual conduct was not relevant to those charges, and (2) J.M.'s previous testimony about her sexual relationship with Ewing did not include the level of violence she alleged occurred during the charged crimes and, in any event, juries are instructed that a defendant's knowledge of a prior

58

event does not matter when considering whether a rape victim was overcome by force or fear.

On appeal, the State first argues that Ewing's failure to raise the issue at trial results in this issue not being preserved for appellate review. In support, the State cites only to K.S.A. 60-404, which requires a contemporaneous objection to the allegedly "erroneous *admission* of evidence," not the allegedly erroneous *exclusion* of evidence. (Emphasis added.) Thus, this procedural challenge fails.

Next, the State contends that this issue is not preserved for appellate review because Ewing failed to "make a proffer of the excluded evidence at trial," as required by K.S.A. 60-405. K.S.A. 60-405 requires that the proponent of evidence must make "known the substance of the evidence in a form and by a method approved by the judge" or "indicate[] the substance of the expected evidence by questions indicating the desired answer." It does not, however, require that the proffer be made "at trial." Ewing described in his pretrial motion and at the hearing on that motion the evidence he wished to present. See *State v. Swint*, 302 Kan. 326, 332, 352 P.3d 1014 (2015) ("[N]o formal proffer is required if an adequate record is made in a manner that discloses the evidence sought to be introduced."). Thus, the State's second preservation argument fails.

As a final threshold argument, the State urges this court to decline to address the issue because Ewing has not provided in his appellate brief a pinpoint reference to the location of the adverse ruling in the record on appeal. The State is correct. Under Supreme Court Rule 6.02(a)(5) (2019 Kan. S. Ct. R. 35), an appellant must provide in his or her appellate brief "a pinpoint reference to the location in the record on appeal where the issue was raised and ruled on." Despite Ewing's failure to comply with this rule, we will still address his claim on appeal.

59

Ewing argues that evidence of his prior sexual relationships with J.M. and M.W. was relevant. The State asserts the opposite and argues in the alternative that any error was harmless. We review the district court's application of the rape shield statute for an abuse of discretion. See *State v. Holman*, 295 Kan. 116, 140, 284 P.3d 251 (2012) (holding that the district court's determination of whether evidence of prior sexual conduct will be probative of a material issue will not be overturned on appeal if reasonable minds could disagree as to the court's decision), *overruled on other grounds by State v. Dunn*, 304 Kan. 773, 810-11, 375 P.3d 332 (2016).

> "Relevancy . . . is the key consideration when applying the rape shield statute . . . . In the past, this court has concluded that prior sexual conduct evidence may be material if it is relevant to issues such as the identity of the rapist, consent of the complaining witness, or whether the defendant actually had intercourse with the complaining witness. The court has cautioned, however, that 'the legislature sent a clear message to the courts that a rape victim's prior sexual activity is generally inadmissible since prior sexual activity, even with the accused, does not of itself imply consent to the act complained of.' [Citations omitted.]" *State v. Berriozabal*, 291 Kan. 568, 586, 243 P.3d 352 (2010).

Ewing argues that the evidence of his prior sexual contact with J.M. and M.W. was relevant "because the State chose to present a theory that the Defendant trolled social media for victims, lured them to his house, plied them with alcohol and raped them." But J.M. acknowledged during cross-examination that she "had spent time with [Ewing] before," including spending her 18th birthday at his house. She also testified that on the night he raped her, she wanted to talk to Ewing about a situation involving a job he had helped her to get. Similarly, M.W. acknowledged on cross-examination that she had dated Ewing before her rape. Thus, to the extent that Ewing contends that evidence of his prior sexual contact with J.M. and M.W. was necessary to rebut the State's theory that Ewing trolled social media to lure J.M. and M.W. to his house on the night he raped them, that argument is unpersuasive.

60

Next, Ewing again contends that evidence of his prior sexual contact with J.M. "is relevant to J.M.'s basis, or lack of basis, for [her] fear" since the charges with respect to J.M. were based on her being overcome by force or fear. The district court rejected this argument, apparently—though not explicitly—finding that J.M. experiencing prior violent sexual contact with Ewing was not relevant to whether she was overcome by force or fear on the night in question.

> """The Kansas [rape shield] statute merely serves to focus both judges' and attorneys' attention upon the fact that the victim's prior sexual activity is not generally relevant, reminding them that a victim's lack of chastity has no bearing whatsoever on her truthfulness and generally has no bearing on the important issue of consent."' [Citations omitted.]" *Fuller v. State*, 303 Kan. 478, 494, 363 P.3d 373 (2015).

Similarly, whether J.M. felt fear—and how fearful she was—during prior violent sexual contact with Ewing on other occasions and under different circumstances has little probative value about whether J.M. was overcome by fear during the events underlying the charges here. To hold otherwise would contradict the objective of the rape shield statute by implicitly finding that a victim's prior consensual sexual conduct, if violent, somehow lessens the fear that may be felt during later nonconsensual violent sexual contact. Simply put, a victim's mindset during prior sexual conduct is generally not indicative of his or her mindset during subsequent sexual conduct. For these reasons, we conclude the district court did not abuse its discretion by excluding Ewing's evidence of his prior sexual relationships with J.M. and M.W.

PROSECUTORIAL ERROR IN CLOSING ARGUMENT

Ewing argues that the prosecutor engaged in "misconduct" during closing argument. Our Supreme Court has emphasized the difference between prosecutorial misconduct and prosecutorial error, noting that "'[p]rosecutorial acts properly categorized as "prosecutorial misconduct" are erroneous acts done with a level of culpability that

61

exceeds mere negligence'" and are errors that "are not 'minor aberrations in a prolonged trial.'" *State v. Chandler*, 307 Kan. 657, 695, 414 P.3d 713 (2018) (finding prosecutorial misconduct). Ewing does not assert that errors here involved this level of culpability, so we shall review his claim for prosecutorial error.

Reviewing claims of prosecutorial error involves a two-step process: consideration of error and consideration of prejudice. *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016).

"To determine whether prosecutorial error has occurred, the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, we simply adopt the traditional constitutional harmlessness inquiry demanded by *Chapman* [*v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)]. In other words, prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.,* where there is no reasonable possibility that the error contributed to the verdict.' . . . [W]hen 'analyzing both constitutional and nonconstitutional error, an appellate court need only address the higher standard of constitutional error.' [Citations omitted.]" *Sherman*, 305 Kan. at 109.

In addition, our Supreme Court has advised:

"Every instance of prosecutorial error will be fact specific, and any appellate test for prejudice must likewise allow the parties the greatest possible leeway to argue the particulars of each individual case. Thus, appellate courts should resist the temptation to articulate categorical pigeonholed factors that purportedly impact whether the State has met its *Chapman* burden. Appellate courts must simply consider any and all alleged indicators of prejudice, as argued by the parties, and then determine whether the State has

62

met its burden—*i.e.*, shown that there is no reasonable possibility that the error contributed to the verdict. The focus of the inquiry is on the impact of the error on the verdict. While the strength of the evidence against the defendant may secondarily impact this analysis one way or the other, it must not become the primary focus of the inquiry." 305 Kan. at 110-11.

Ewing identifies several comments the prosecutor made during closing argument that he contends do not accurately reflect the evidence admitted at trial. Each statement is examined below, with the challenged statement italicized. In general:

"'A prosecutor has wide latitude in crafting arguments and drawing "reasonable inferences from the evidence but may not comment on facts outside the evidence." Any argument "must accurately reflect the evidence, accurately state the law, and cannot be 'intended to inflame the passions or prejudices of the jury or to divert the jury from its duty to decide the case based on the evidence and the controlling law.'" [Citations omitted.]'" *State v. Anderson*, 308 Kan. 1251, 1261, 427 P.3d 847 (2018).

First, Ewing contends that the following statement misrepresented the evidence presented by White, the KBI forensic scientist who performed DNA analysis:

"Now, [J.M.] told everyone, and there's no contradiction to this, that when she went to bed in the defendant's bed she was fully clothed. Why is that important? It's important because of the defendant's DNA around the waistband of [J.M.'s] panties. *You cannot get the defendant's DNA there unless [J.M.] was unclothed. She went to bed in panties and sweats. Unless the sweats are taken off, she would not have the defendant's DNA there*. And the only reason that [J.M.'s] panties were exposed was because the defendant took her pants off." (Emphasis added.)

White testified at trial that she tested swabs taken from the waistband of J.M.'s underwear for "touch DNA," which occurs when "an individual has simply touched an item and left behind some of their skin cells just in the process of touching that item." She acknowledged that an individual sheds "a very large number" of skin cells daily, but

recovery of touch DNA does not require a large number of cells. She also testified that human beings leave our DNA in our homes, in our laundry, in our bathrooms, and in our beds and that although touch DNA is generally left by touching an item, touch DNA can also result when skin cells are transferred from another item. Specifically, White conceded that if someone wearing underwear lay down on bedsheets, touch DNA could transfer from the bedsheets to the underwear. With respect to the testing in this case, White testified that swabs from the waistband of J.M.'s underwear showed a DNA consistent with Ewing's DNA profile. The report memorializing her testing, which was admitted into evidence, stated that "Ewing and all his male paternal relatives cannot be excluded as possible contributors to the biological material" on the waistband, and it also stated that "[t]he probability of selecting an unrelated male at random from the general population with the major male DNA haplotype obtained from the swabs of [J.M.'s underwear waistband] is approximately 1 in every 5,556 individuals."

Prosecutors are allowed to draw reasonable inferences from the evidence, which is how the State characterizes the statement quoted above. See *State v. Banks*, 306 Kan. 854, 862, 397 P.3d 1195 (2017) ("[P]rosecutors are allowed '"to craft arguments that include reasonable inferences to be drawn from the evidence."'"). Although acknowledging that "it was 'possible' that waistband DNA cells transferred from the sheets to the panties," the State argues that the prosecutor's statement was a reasonable inference "that Ewing's DNA transferred in the process of pulling sweats and panties off of J.M. and ripping them in the process."

Here, the State's characterization of the prosecutor's statement as a permissible inference is unpersuasive. By informing the jury that Ewing's DNA "cannot" be on J.M.'s underwear unless her sweatpants were removed, the prosecutor misrepresented the evidence. In *State v. Corey*, 304 Kan. 721, 735-36, 374 P.3d 654 (2016), our Supreme Court found a similarly absolute statement about DNA evidence constituted error. There, the prosecutor repeatedly stated during closing argument that the defendant's DNA had

64

been found on the victim's stomach, but our Supreme Court held: "The problem is that the statistical match between Corey's DNA and the DNA recovered from [the victim's] stomach was not as conclusive as the prosecutor represented" and, thus, the comment was error. 304 Kan. at 736. Similarly, here, the prosecutor informed the jury that Ewing's DNA could not—as a certainty—be on J.M.'s underwear waistband unless her sweatpants had been removed. This is unsupported by White's testimony, especially considered in context with J.M.'s own testimony that she did not remember whether she had changed clothes in Ewing's bathroom or his bedroom, and she did not remember whether she laid the sweatpants on Ewing's bed before changing into them.

"It is permissible for a prosecutor to argue that the evidence demonstrates a defendant's guilt." *State v. Peppers*, 294 Kan. 377, 399, 276 P.3d 148 (2012). Thus, had the prosecutor asserted that the DNA evidence *supported* the conclusion that J.M.'s sweatpants were removed, that would not be error. The prosecutor stated, however, that the DNA *could not* be there unless J.M.'s sweatpants were removed. This misrepresented the evidence that had been admitted for the jury's consideration and, as such, was error.

Next, Ewing challenges the prosecutor's reference to J.M. as "a low-functioning young woman" and the associated assertions that Ewing "likes to watch autism abuse pornography." Specifically, the prosecutor said: "Only thing that makes sense from the evidence is that [Ewing] is guilty. [J.M.], when she testified, was asked to put the date on a picture and [she] asked, 'What number is June?' [*J.M.*] *is a low-functioning young woman, and the defendant likes to watch autism abuse pornography*." (Emphasis added.)

Ewing correctly notes that there was no evidence at trial that J.M. was "low-functioning" or autistic. In fact, the record reflects that Malick testified that J.M. did "not hav[e] intellectual disabilities but [she was] just slow and methodical in her approach to responding to questions." The State responds only that "the jury had occasion to observe [J.M.] as she testified."

65

"[I]t is well known that jurors 'must decide a case on evidence and controlling law, and not on sympathy, emotion, or prejudice.' Therefore, '"[p]rosecutors are not allowed to make statements that inflame the passions or prejudices of the jury or distract the jury from its duty to make decisions based on the evidence and the controlling law."' This means that a prosecutor has a duty to refrain from making improper, leading, inflammatory, or irrelevant statements to the jury and 'must guard against appeals to jurors' sympathies or prejudices.' [Citations omitted.]" *State v. Holt*, 300 Kan. 985, 992, 336 P.3d 312 (2014).

Prosecutors enjoy wide latitude in making closing arguments, but their arguments must be consistent with the evidence presented at trial. *Lowery*, 308 Kan. at 1209. There was no evidence that J.M. was "a low-functioning young woman," whatever that means. This statement was prosecutorial error. It also appears likely that this statement—immediately followed by a reference to "autism abuse"—was made to inflame the passions of the jury, which is also error.

Next, Ewing challenges two statements the prosecutor made that referenced J.M., M.W., and A.L. as being "victimized" on social media. The first statement was:

"[T]he delay in the reporting is in part because of what we saw in this courtroom, because women who have been sexually assaulted do not want to be cross-examined on it. They do not want to tell well-intending but still strange people to them about a sexual experience. *They do not want to be victimized on social media by the defendant's friends or family*. They do not want to have the embarrassment, the humiliation that these young women have had to know." (Emphasis added.)

As Ewing argues, there was no evidence presented at trial that M.W. or J.M. were victimized on social media by Ewing's friends or family. The State contends that taken in context, the challenged statement does not imply that Ewing's family and/or friends victimized J.M. and/or M.W. on social media; rather, the State asserts, it is merely "one of many reasons for delayed reporting." The State's characterization is unpersuasive. Not

66

only was there no evidence that M.W. or J.M. were victimized on social media by Ewing's friends or family, but during Dunn's testimony, the district court sustained an objection to the prosecutor's question about contact between M.W. and Ewing's family, and the court ruled that Ewing's family's behavior toward M.W. was irrelevant to the material issues at trial. Thus, we agree with Ewing that the prosecutor's above-quoted statement misstated the evidence and appears to have been made solely to inflame the jury's passions and prejudices, and the statement was therefore error.

The second comment along these lines made by the prosecutor was:

"Are these gals looking for attention? The only attention they've got in this case is negative attention. [J.M. and A.L.] both were described as passive, shy. They're not looking for attention. There's pictures of [J.M.'s] vagina put into evidence. Anybody want that attention? Dr. Allison talked to you about women do not report because they don't want the attention. This is a scarlet letter, is what this case is about, and *the scarlet letter is simply this, that these three women have been branded. In the public and social media they've been branded, and nobody seeks out that type of attention. The ugliness that has been directed towards these women can be taken into consideration for you when you decide whether or not you believe their testimony*." (Emphasis added.)

As to this comment, the State concedes on appeal that "[t]he being 'branded' or 'ugliness' comment does not appear to have an evidentiary basis." A review of the record supports this conclusion. Again, the prosecutor's comment misstated the evidence and appears to have been made solely to inflame the jury's passions and prejudices, and as such, the statement was error.

Next, Ewing challenges the following statement: "So in [M.W.'s] case the defendant acknowledges that they had sex. It's different from [J.M.'s], but in [M.W.'s] case the defendant is saying it was consensual. *So with* [*J.M.*] *you have to decide whether they had sex or not. If they did, it could not have been consensual.*" (Emphasis added.)

67

Ewing argues this was "a misstatement of fact and law" because "[t]he crux of the case involving J.M. was whether or not they had sexual intercourse and if they did, was it consensual." The State responds only that it was proper to argue that it was not consensual because "[t]here are facts to support that inference."

Once again, the error in these statements lies in the prosecutor's wording of her assertion to imply a certain and foregone conclusion: if the jury concluded that Ewing and J.M. had sex, then it "could not" have been consensual. Although Ewing did not assert consent as a defense—he maintained that he could not remember the events of the night in question—it was a misstatement for the prosecutor to inform the jury that if any sexual acts occurred that night, they were as a matter of fact nonconsensual. The prosecutor's comment misstated the evidence and was error.

Next, during the final moments of her initial closing argument, the prosecutor reminded the jury that Ewing's cell phone had been seized and examined. The prosecutor then stated: "Now, folks, while the defense is telling you that the defendant did not watch those videos[,] know this, the evidence shows differently." Ewing argues that this comment misstated the facts and evidence, since Malick specifically admitted during his testimony that he could not say with any certainty whether the excerpts in State's Exhibit 66 had been watched on Ewing's cell phone. The State argues that State's Exhibit 66 reflecting "what Ewing was accused of doing" supports a reasonable inference that Ewing watched the videos shown on State's Exhibit 66.

In general, evidence that videos were accessed through a cell phone can lead to a reasonable inference that the owner of the cell phone watched the videos. But here, there was specific testimony that undermined the reasonableness of such an inference. First, Malick expressly testified that he—the individual who had created State's Exhibit 66— "can't tell you what section of the video was watch[ed] or was not watched." Second, Malick testified that the data from the cell phone suggested that only portions of the

68

videos were watched, rather than the videos being watched in their entirety in one sitting. To the extent that the prosecutor's comment directly contradicted Malick's testimony about the videos, we find that the comment misstated the evidence and constituted error.

Next, Ewing challenges a reference to his alleged nickname, "poon-stabber." During the rebuttal portion of her closing argument, the prosecutor stated:

> "Now, the defense says that the defendant is not a person who rapes. *Well, a person who rapes might actually be proven guilty when three women come forward, when the women that he's been with describe him as controlling, when he's proud of the pune-stabber [sic]. He put, 'Stabber,' on his toolbox at work. That's not something somebody gave him and they laugh. Dude's proud of it.*" (Emphasis added.)

Ewing contends that this comment is not based on evidence, "as . . . Malick could not testify who painted 'stabber' on the toolbox" and "McKenna testified that the nickname was given to [Ewing] by his friends as a joke." In response, the State asserts that it is a reasonable inference that Ewing, as the owner of the toolbox, put the name on it and Malick testified that the "impression" he got from talking to McKenna "'was that that name was endeared by [*sic*] Mr. Ewing.'"

At trial, Malick testified that the data from Ewing's computer showed that on a website that asked "what is your porn name if you were to have one," Ewing responded "poon-stabber." Malick also testified that he saw a toolbox at the factory where Ewing used to work that had the word "stabber" painted on it. State's Exhibit 120 was a picture Malick found on Ewing's Instagram account that "appears to be" Ewing's locker at his former workplace; sitting on top of the locker was the toolbox described above. In light of all this evidence, it is reasonable to infer that the toolbox in State's Exhibit 120 belonged to Ewing, that he painted the word "stabber" on it, and that he was proud of the name. Thus, the prosecutor's statement as quoted above was not error.

Next, Ewing challenges the statement: "Now, Malick told you that he found, 'Pimp works over one of his hoes and she takes a rough and mean pounding.' That's not something that people watch unless they enjoy violence against women." Ewing argues that this comment is prosecutorial error because "there was no evidence that watching violent porn results in violence against women." We have already found in this opinion that the district court erred by admitting the pornography evidence contained in State's Exhibit 66. Here, the prosecutor is compounding the district court's error by commenting on that evidence in her closing argument. But because the pornography evidence was admitted at trial by the district court, we cannot say that the prosecutor's comment misstated the evidence or amounted to prosecutorial error.

Finally, Ewing turns to the following statement the prosecutor made during the rebuttal portion of her closing argument:

> "'Fist-fucked and double-donged for days,' now, the defense says this is all smoke. It's not smoke, it's evidence of an attitude of what—of how you treat women. *'I love rough porn,' yes, he does. Too drunk to fuck, yes, he does. Autism abuse, yes, he does. Drunken sex gone wrong, he sure does.*" (Emphasis added.)

Ewing argues that the italicized language above is contrary to the evidence presented at trial because there was no evidence that he abused anyone with autism. The State appears to concede this point, stating that "[i]f it was not supported by the evidence, then any error was harmless." Ewing is correct; there was no evidence presented at trial that he abused any individual with autism. Moreover, the statement improperly inflamed the passions and prejudices of the jury by painting Ewing as a bad person who preyed on especially vulnerable women. As such, the prosecutor's comment amounted to error.

*Harmless error analysis*

Because there was prosecutorial error during closing argument, this court must examine "whether the error[s] prejudiced [Ewing's] due process rights to a fair trial" by determining whether the State has "demonstrate[d] 'beyond a reasonable doubt that the error[s] complained of . . . did not affect the outcome of the trial in light of the entire record.'" *Sherman*, 305 Kan. at 109. To do so, this court "must . . . consider any and all alleged indicators of prejudice, as argued by the parties." 305 Kan. at 111.

The State notes that defense counsel did not object to any of the statements challenged on appeal. "A timely objection is not a precondition for appellate review of a prosecutor's comments made during . . . closing argument. But defense counsel's objection—or its absence—may impact our analysis." *State v. King*, 308 Kan. 16, 30, 417 P.3d 1073 (2018). As for the references to autism abuse, the State specifically asserts any error was harmless because, as the district court observed post-trial, the State "did not overemphasize that title" and the woman in the excerpts from the "autism abuse" video "wasn't even obviously autistic, whatever that might mean."

The State also argues that the jury was specifically instructed to disregard any statements during closing argument that were unsupported by the evidence. Finally, the State contends that any prosecutorial error in closing argument was harmless because the evidence against Ewing was so strong. The State points out that it presented almost 30 witnesses, medical evidence, DNA evidence, expert testimony about delayed reporting of rape, and witnesses who saw J.M. and M.W. shortly after the crimes against them.

The district court here instructed the jury to "disregard any testimony or exhibit which I did not admit into evidence." The State is correct that the district court also instructed:  "Statements, arguments and remarks of counsel are intended to help you in understanding the evidence and in applying the law, but they are not the evidence. If any

statements are made that are not supported by the evidence, they should be disregarded." Without evidence to the contrary, courts presume that jurors follow instructions. *State v. Mattox*, 305 Kan. 1015, 1027, 390 P.3d 514 (2017).

As to the strength of the evidence against Ewing, we agree that the State presented extensive evidence at trial. But extensive evidence does not always equate to convincing evidence. In the end, the State's case against Ewing rested on the credibility of the testimony of the complaining witnesses. Also, our Supreme Court's position on this point is clear: "The focus of the inquiry is on the impact of the error on the verdict. While the strength of the evidence against the defendant may secondarily impact this analysis one way or the other, it must not become the primary focus of the inquiry." *Sherman*, 305 Kan. at 111. Thus, prosecutorial error can require reversal of even a very strong case against the defendant. See *State v. Tosh*, 278 Kan. 83, 97-98, 91 P.3d 1204 (2004), *overruled on other grounds by Sherman*, 305 Kan. 88.

Considering the multiple instances of prosecutorial error we have identified in this opinion, we find it difficult to conclude that the State has demonstrated beyond a reasonable doubt that the errors did not affect the outcome of the trial in light of the entire record. First, with respect to the State's argument about the isolated nature of the possible error of referring to "autism abuse," it is true that the prosecutor only referred to "autism abuse" twice in closing argument. But those comments—telling the jury that Ewing enjoys abusing vulnerable individuals and implying that J.M. falls into that category— were especially prejudicial, as society uniquely condemns sexual violence against victims who are viewed as particularly vulnerable. Implying—with no evidentiary basis—that J.M.'s assault was related to Ewing's enjoyment of watching pornographic "autism abuse" could have easily affected the jury's adherence to its duty to decide the case on the evidence before it and the controlling law.

72

Next, Ewing has identified several other instances where the prosecutor misstated the evidence in closing argument, with possibly the most serious error being the misstatement about what the DNA evidence proved. In many of these instances, the prosecutor not only misstated the evidence, but the comments appeared to have been designed to inflame the passions and prejudices of the jury. Given the conflicting nature of the evidence admitted at trial, it is reasonable to believe that the jury took to heart the prosecutor's comments during closing argument that purported to represent the evidence, even when those statements did so inaccurately.

Finally, some of the prosecutor's improper comments referred to the pornography evidence in State's Exhibit 66 which we have found was improperly admitted at trial. In particular, the prosecutor stated that the evidence showed that Ewing definitely had watched the videos, even though this comment directly contradicted Malick's testimony. As a result, the district court's serious error by admitting State's Exhibit 66 was compounded by the prosecutor's misstatement of the evidence in closing argument.

Although we have identified several instances of serious prosecutorial error in closing argument, we stop short of reaching any final conclusion as to whether prosecutorial error, standing alone, requires the reversal of Ewing's convictions. Instead, we will reserve our final ruling on this subject until we address Ewing's claim that he was denied a fair trial based on cumulative error.

## EWING'S CLAIM OF CUMULATIVE ERROR

Finally, Ewing argues that the cumulative effect of the errors he has asserted substantially prejudiced him and denied him a fair trial. In response, the State argues that prejudicial cumulative error cannot exist where "the evidence is overwhelming against the defendant."

"'When faced with a cumulative error claim, this court conducts an unlimited review of the entire record to determine whether the totality of the circumstances establishes that the cumulative effect of trial errors substantially prejudiced the defendant and denied the defendant a fair trial.' However, 'if any of the errors being aggregated are constitutional in nature, the cumulative error must be harmless beyond a reasonable doubt.' [Citations omitted.]" *State v. Robinson*, 306 Kan. 1012, 1034, 399 P.3d 194 (2017).

Several relevant factors help show "whether errors were cumulatively harmful, including the effectiveness of any remedial efforts by the district court at the time the error arose; the nature and number of errors committed and their interrelationship, if any; and the strength of the evidence." *Lowery*, 308 Kan. at 1243.

Here, we have identified two serious errors committed in Ewing's trial. First, the district court admitted evidence of pornography allegedly viewed by Ewing without the State showing that Ewing had ever viewed the pornography or that it was relevant to the charges brought against him. Second, the prosecutor erred in closing argument by misstating the evidence that was presented to the jury and inflaming the passions of the jury. To some extent, the errors were interrelated because some of the prosecutor's improper comments were related to the pornography evidence.

Contrary to the State's assertion, we do not find that the evidence against Ewing was "overwhelming." This case was largely a credibility contest; the verdicts depended on whether the jury believed J.M. and M.W. There was no DNA evidence linking Ewing to the crimes other than the touch DNA found on the waistband of J.M.'s underwear. And the prosecutor misstated what the DNA evidence proved in her closing argument.

Moreover, the prosecutor relied heavily on her portrayal of Ewing as a bad person who watched violent pornography and committed similar violent sexual acts on unwilling victims. Although the access of violent pornography on Ewing's cell phone might be

74

relevant, the images shown to the jury through State's Exhibit 66 and then reinforced by the prosecutor's repeated and erroneous references during closing argument to Ewing's alleged enjoyment of "autism abuse" likely affected the outcome of Ewing's trial.

We do not lightly set aside a jury's verdict after hearing five days of evidence at trial, especially on such serious charges as rape and aggravated criminal sodomy. But the burden is on the State to show that the cumulative error committed in this case was harmless beyond a reasonable doubt. The State has failed to meet this burden. We hasten to point out that our finding is in no way intended to be a comment on the credibility of the alleged victims in this case. But the Constitution requires that Ewing receive a fair trial on the charges the State has brought against him, and we conclude that the cumulative effect of the errors committed by the district court and the prosecutor denied Ewing his constitutional right to a fair trial. Thus, we are compelled to reverse Ewing's convictions and remand this case to the district court to conduct a new trial.

Reversed and remanded.